## In re RIEGER, KAPNER & ALTMARK.

### (District Court, S. D. Ohio, E. D. November 4, 1907.)

### No. 1,651.

1. CORPORATIONS—DOCTRINE OF CORPORATE ENTITY—WHEN DISREGARDED IN EQUITY.

The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud.

2. BANKRUPTCY—RECEIVER FOR PARTNERSHIP PROPERTY—EXTENSION TO PROPERTY OF CORPORATION.

A partnership engaged in the commission business, and in buying and selling merchandise, acquired for partnership purposes 99 per cent. of the outstanding stock of a manufacturing corporation, the remaining shares being held by relatives of one of the partners. The partners held about equal amounts of the stock, and, as directors and officers, managed the business of the corporation, the partnership taking and selling all of its output. *Held*, that the corporation was merely an agency of the partnership, and its property assets of the bankrupt estate, to which the receivership of such estate would be extended, and the respective rights of partnership and corporate creditors would be determined in the bankruptcy proceedings.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 165.]

157 F.—39

In Bankruptcy. On Application for Extension of Receivership.

Louis Kramer and James N. Rosenberg, for receivers.

T. H. Southard and E. F. O'Neal, for Kapner Bros. & Duga Hosiery Co.

SATER, District Judge. On the 17th day of August, 1907, a petition in involuntary bankruptcy was filed in this court against the partnership firm of Rieger, Kapner & Altmark, and Frank Rieger, Jacob Kapner, Adolph Kapner, and Louis Altmark, the four individuals composing such firm. The defendants other than Rieger, who had disappeared and whose whereabouts was unknown, answered, consenting to an adjudication against them respectively. On the 20th day of August a petition in involuntary bankruptcy was filed in the United States District Court for the Southern District of New York against the same parties, other than Jacob Kapner, who was subsequently, by amendment, brought into the case. Frederick C. McLaughlin was in that case appointed receiver of all of the property of the defendants, and on the 24th day of August he was directed to take possession of the hosiery mills of the Kapner Bros. & Duga Hosiery Company, an Ohio corporation, operating at Zanesville, Dresden, and Frazeysburg, Ohio. The alleged bankrupts were restrained at the same time from interfering in any wise with the receiver in his possession and in his taking possession of the property, and this court was requested to assist the receiver in securing and maintaining possession of such property, and to make such ancillary orders as may be proper and requisite.

On the 26th day of August, on application of the petitioners filed in this court, C. T. Marshall and Frederick C. McLaughlin were appointed receivers of all the property belonging to the partnership firm, and directed to take charge of the same. On the same day an application was made to extend the receivership to the property of the above-named corporation, which is alleged to be a subsidiary company to the partnership. The application recites that the capital stock of the corporation is $50,000, divided into 500 shares, all of which is owned by the partners, which certificates of stock constitute a part of the assets of the alleged bankrupts. Of the stock issued, shares of the face value of $27,200 are in the possession of McLaughlin as receiver. Other shares of the face value of $12,300 are held by Edward Moyse & Company, stockbrokers of New York City, who desire the receivers to take possession of the property of the corporation, and the residue of the stock, being the holdings of Jacob Kapner, is said to be held by the Guardian Trust Company, of Pittsburg, Pa. The application further charges that the confessed bankrupts are in control of the corporate business, that the partnership business which was conducted in the city of New York was abandoned on the 14th day of August, and that if the defendants be permitted to remain in control of the property and assets of the corporation they will remove and dispose of it, to the irreparable damage of the creditors of both the partnership and the corporation. The prayer of the application is that the receivers be given possession of the corporate property as part of the assets of the bankrupts' estate, and that the offi-

cers and agents of the corporation be enjoined from disposing of the corporation's property pending the hearing. On August 30th a hearing was had on such application. The corporation and the defendants other than Rieger, who has not appeared, resist the application to extend the receivership to the corporate property, and assert that the corporation has at all times since its organization existed as a separate and distinct entity, and is in no respect subsidiary to the partnership. At the time the proceedings in bankruptcy were commenced, of the 500 shares of authorized capital stock, 490 shares had been issued. Ten shares remained as treasury stock. Jacob Kapner, Louis Altmark, and Frank Rieger each owned 123 shares. R. Kapner, an uncle of Jacob Kapner, owned four shares; and Abe Kapner, son of Jacob Kapner, owned one share, which share was issued to him two years ago, when he was but 19 years of age. The residue of the issued stock, aggregating 116 shares, was owned by Adolph Kapner. The members of the partnership firm owned 485 shares of the outstanding stock, and relatives of Jacob Kapner owned the remaining 5 shares.

The corporation was organized in 1896, to manufacture hosiery, and was owned by the Kapners and Duga. The partnership was formed in 1901, and engaged in a commission business, selling hosiery and gloves, and in the manufacture of pants and coats. It asserts itself to be the sole agent of the corporation. The firm business was so loosely conducted that neither Altmark, who had charge of the hosiery department, nor Jacob Kapner could give any idea of its debts. The corporation and the firm each kept its own books and bank account, but the business between the corporation and the partnership has been so conducted that the state of accounts between them is in dispute, and, so far as the record shows, is unknown, although the partnership took the corporation's entire product, and the books of either concern ought to show the exact condition of the two concerns with reference to each other. Jacob Kapner, who was the president and treasurer of the corporation and in charge of its finances, was unable to state even approximately the condition of the account, or how much the corporation owed the firm, whether it was $60,000 or more. He professes not to know which owes the other, or when the corporation last invoiced. He bought the merchandise, and looked after the raw material for the corporation, and yet states that he does not know what the corporation owes, although, on further inquiry, he testifies that it owes between $60,000 and $70,000, in addition to the $118,000 mortgage given to O'Neal. The secretary, Abe Kapner, testifies that the past-due obligations of the corporation are from $150,000 to $200,000. Jacob Kapner first states that he could not recollect who the corporation directors were prior to the 29th day of August, although on that date the board of directors held a meeting at which he presided, and at which one was removed, and three, including himself, went through the formality of resigning. Further examination was required to develop from him that the board consisted of the four partners and his son, Abe. He disclaims knowledge of the firm's assets which are in New York, or an understanding of the

firm books. He values the corporation's mills at $150,000, its trademark at $50,000, and its merchandise at from $140,000 to $150,000. Only one of the mills—the one at Dresden—is owned in fee, the other two being leased property. The witness Shore values the mills and machinery at $150,000. The value of the corporation's trade-mark and merchandise must be regarded as problematical. Jacob Kapner's ignorance, real or professed, about matters with which he ought to have been familiar, if he in fact was not so, reflects seriously on the value of his uncorroborated statements. He was either surprisingly ignorant or forgetful of his own affairs, or willing to conceal the facts regarding them. To meet its pressing obligations, the corporation, on August 20th, executed and delivered to O'Neal a mortgage for $118,000, securing 46 notes. These notes were negotiated by O'Neal, and the money realized therefrom, excepting about $6,000 which was due to himself, was advanced to the corporation. To meet its pay rolls it has been transferring its orders and accounts receivable to banks, as security for money advanced for that purpose. It has no bills receivable or outstanding accounts. As fast as these were made, down to the time of the institution of bankruptcy proceedings, they were turned over, sold, to the firm.

Are the partnership and the corporation separate and distinct legal entities, or is one subsidiary and auxiliary to the other? These are the questions to be answered, and, although Jacob Kapner and Altmark repeatedly assert that the partnership is the sole agent of the corporation, and that the two concerns exist and have existed as such entities, these questions must be determined by the court from the facts adduced and the law applicable thereto. Altmark's testimony shows that the corporate stock purchased in 1901 was bought by the partnership for partnership purposes and to insure to the partnership the control of the product of the corporation's mills.

The partnership owns 99 per cent. of the stock. As the record does not disclose the interest of the respective partners in the firm, the presumption is that they are equal partners; and it is significant that the number of shares of corporate stock standing in the name of each is the same, excepting that the shares accredited to Adolph Kapner are seven less than to each of his copartners. That Abe Kapner and R. Kapner, son and uncle, respectively, of Jacob Kapner, hold five shares of the stock does not militate seriously against the sole ownership by the members of the firm. In Bank v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834, 4 out of 500 shares of stock were held by Trebein's relatives by blood or marriage, but that fact did not, under the circumstances of that case, deter the court from holding that the corporation was in substance another Trebein. The Great Western Natural Gas & Oil Co. was held, in Re Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530, to be a mere agent of the pulp company, and as having "no shadow of claim to the property" held in its name, notwithstanding the fact that one of its shares of stock was held by a person who was not a party to its organization, as an agent and creation of the pulp company. It is not shown when or how R. Kapner acquired his four shares of stock, or that as a stockholder he ever participated in the corporate affairs. Instead of the partnership being the agent of the corporation, the cor-

poration was the instrumentality acquired by the partnership to supply it with goods for the market. The corporate organization, it is true, was maintained, but it was for the purpose of facilitating and benefiting the partnership business. It was but a mere adjunct of the partnership. The partners acquired the corporate stock, made themselves the directors of the corporation, and owned, operated, and controlled both concerns, and used the corporation's trade-mark on their billheads. They shared in the profits made or losses sustained by the company. These four men as directors constituted themselves as partners a selling agency to dispose of their own manufactured product. This is as unusual as it would be for a natural person, doing business in his correct name, to designate himself, or contract with himself, as his own agent regarding another branch of his business conducted by himself under a fictitious name, and to hold himself out to the public as two distinct persons. That he should so represent himself and keep for his two kinds of business separate books and separate bank accounts might give him a double line of credit, and might hinder and delay his creditors in reaching his assets in case of insolvency, but a court of equity, having knowledge of the fact, would have no difficulty in brushing aside the subterfuge, and subjecting the whole of his property to the payment of his debts. The four individuals composing the firm may have obtained—doubtless did obtain—a larger credit by operating in two names. That they so used whatever credit was accorded them as to entail loss on many of those who bestowed it is manifest from the record and their admissions of insolvency. As the corporation was subsidiary to and the mere agency of the partnership, the representation that the partnership is the sole agent of the corporation is untrue and misleading. To deny the individual and partnership creditors participation in the administration of so much of the bankrupts' estate as may be found in possession of the corporation, and to compel such creditors to remain silent spectators until the corporate creditors shall have been paid in full out of the proceeds of the sales of the corporate property, or out of the profits of the business if it should be profitably continued, or until the corporate property is exhausted, is to deny them a right guaranteed by the bankrupt act, and to hinder and delay them in the pursuit of their legal remedies against the bankrupts and their property, and is, consequently, fraudulent in law, however honestly the partners may have intended to deal with their creditors in case of insolvency. Bank v. Trebein Co., 59 Ohio St. 316–325, 52 N. E. 834. The individual partnership creditors have a direct interest in the corporate assets, for, assuming, without deciding, that the innocent corporate creditors must first be paid out of the corporate property, the residue, if any, would pass for administration to the trustee in bankruptcy.

The fiction of legal corporate entity cannot be so applied by the partners as to work a fraud on a part of their creditors, or hinder and delay them in the collection of their claims, and thus defeat the provisions of the bankrupt act. The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud. The case of Re

Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530, is closely in point. The pulp company, which subsequently became bankrupt, caused the incorporation and organization of the Great Western Natural Gas & Oil Company, and the transfer to it of its gas and oil wells and lands. The president and treasurer of the pulp company owned all of the stock of the Great Western Company, though one share was put into the name of a third party for the purpose of having a resident director in Indiana. The Great Western Company was treated as an agent of the pulp company for the development of its business, especially for the supplying of cheap motor power. The pulp company, having become bankrupt, the receiver demanded the delivery to him of the property in the possession of the Great Western Company as a part of the assets of the pulp company. The demand was resisted, but Coxe, Circuit Judge, said:

"The Great Western Company has no shadow of claim to the property in controversy, and to permit it, or its president or shareholders, to dispose of such property is to sanction a fraud upon the creditors of the Pulp Company. * * * The new oil company was the old company under another name."

The president of the oil company was required to turn over to the receiver the property of the bankrupt in his possession or under his control. In Interstate Telegraph Co. v. Baltimore & Ohio Telegraph Co. (C. C.) 51 Fed. 49, affirmed in 54 Fed. 50, it appears that the railroad company caused the telegraph company to be incorporated, became the sole owner of its stock, selected its own officers and employés as officers of the new company, and represented such company to have authority to contract with reference to its whole railway telegraph system. It was held that the railroad company was not only the actual owner of the telegraph company, but that the latter company was a mere department, or bureau, of the railroad company, created and maintained for the railroad company's benefit as an agent to make contracts. It follows as a corollary that, had the railroad company become insolvent while the telegraph company was in existence, the property in the possession of the telegraph company, notwithstanding its corporate entity, would, if necessary, have been treated as property of the railroad company. The Supreme Court of Ohio has repeatedly ignored the fiction of legal corporate entity when used as a shield for fraudulent or other illegal acts. The rule is clearly stated in Bank v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834, as follows:

"In contemplation of law, a corporation is a legal entity, an ideal person, separate from the real persons who compose it. This fiction, however, is limited to the uses and purposes for which it was adopted—convenience in the transaction of business, and in suing and being sued in its corporate name, and the continuance of its rights and liabilities, unaffected by changes in its corporate members. But the fiction cannot be abused. A corporation cannot be formed for the purpose of accomplishing a fraud or other illegal act under the disguise of the fiction; and, when this is made to appear, the fiction will be disregarded by the courts, and the acts of the real parties dealt with as though no such corporation had been formed, on the ground that fraud vitiates everything into which it enters, including the most solemn acts of men. * * * The good faith of the parties to such a transaction must be determined by its legal effect on the rights of others. If its legal effect works a fraud on their rights, the finding of a court that the parties acted in good faith is simply an erroneous conclusion of law from the facts."

Other authorities are Cincinnati Volksblatt Co. v. Hoffmeister, 62 Ohio St. 189, 200, 56 N. E. 1033, 48 L. R. A. 732, 78 Am. St. Rep. 707; State v. Standard Oil Co., 49 Ohio St. 137, 177–179, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541; Brundred v. Rice, 49 Ohio St. 640, 32 N. E. 169, 34 Am. St. Rep. 589; Thompson on Corporations, § 1077; Cook on Corporations (4th Ed.) p. 23; 7 Ency. Am. & Eng. Law, 633, 634.

After the bankruptcy proceedings were commenced—the institution of which was a caveat "to all the world, and, in effect, an attachment and injunction" (Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405)—after the receiver had been appointed and qualified, and authorized and directed to take possession of the hosiery mills in question and all the property of the firm, and the alleged bankrupts were enjoined from taking any steps to interfere with or prevent the receiver from so taking possession, a portion of the corporate directors, on the day before the hearing of this cause, went through the formality of selecting a new directory. Rieger and Adolph Kapner were not notified of the meeting. However, it may be said, as regards Rieger, that his location was unknown. The record of that meeting shows that, notwithstanding the rule that a director cannot vote by proxy (Marshall on Private Corporations, 125) Jacob Kapner held the proxy of Adolph Kapner "to perform such duties as a director as the said Adolph Kapner would be entitled to perform were he personally present hereat." Abe Kapner, who was continued as a director, however, testifies that he held the proxy. Rieger was removed without notice. The three remaining directors resigned in turn, and the places of all four were successively filled by persons who had each purchased from the corporation, through Adolph Kapner as president, one share of stock. One of the newly elected directors is the attorney of the partnership; another is a mortgage creditor of the corporation and the attorney of other creditors. Whether the other two directors are creditors, or represent creditors, of the corporation is not disclosed by the record. Without casting any reflection on the newly elected directors, for we may assume they believed the corporation not to be subsidiary to the partnership, it is safe to say the change of the directory was made in the interest of the corporate creditors. The partners who participated in the directors' meeting, however honestly they originally intended to deal with all the creditors, thereby assumed the aggressive in hindering and delaying a part of their creditors in the pursuit of their legal remedies against the bankrupts and their property for the collection of their claims, and, under the doctrine of Bank v. Trebein, supra, their conduct was fraudulent. The validity or the invalidity of the directors' meeting, of Rieger's removal from the directory, of the election of the new directors, of the sale to them and the purchase by them of corporate stock, is at this time immaterial, and need not be considered. The law prohibits the bankrupts from discriminating against any class of their creditors, and no board of directors, whether it be new or old, will be permitted to withhold from administration the property of the bankrupts. Re Muncie Pulp Co., supra, and the cases therein cited are authority for the receiver's recovery of the property in a summary proceeding like this.

' ·An order may. be drawn extending the receivership to the property ·in the possession of the corporation as a part of the assets of the ·partnership, and vesting in the receivers such power as will preserve ,the rights of all parties in interest, and prevent,. if practicable and if ,thought best, the stoppage of the business and any result which would depreciate or tend to depreciate the assets.· The receivers will take possession of such property, of every nature and description, and the corporation, its officers, agents, and employés are directed to deliver the same to them.  ·