## E. E. GRAY CORPORATION v. MEEHAN.

No. 2621.

Circuit Court of Appeals, First Circuit.

Dec. 17, 1931.

Joseph B. Jacobs, of Boston, Mass. (Alton F. Tupper and Jacobs & Jacobs, all of Boston, Mass., on the brief), for appellant.

Harry Bergson, of Boston, Mass. (Danforth W. Comins of Boston, Mass., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

224

WILSON, Circuit Judge.

This is an appeal from a decree of the district court of Massachusetts affirming an order of a referee in bankruptcy rejecting a claim of the appellant.

The bankrupt corporation, the E. E. Gray Company, was organized in 1914 and conducted a chain of grocery stores in several cities in the commonwealth of Massachusetts. In 1927, being in need of funds to extend its chain of stores, its officers organized a new corporation, the appellant in these proceedings, with charter powers to loan money to or assist in any way any corporation in which it was interested. The admitted purpose of the new corporation was to acquire the necessary funds to extend and enlarge the business of the E. E. Gray Company by the sale of its stock. (Hereinafter the new corporation will be referred to as the corporation, and the old corporation as the company.)

In some way not disclosed by the record the corporation acquired all but 5 per cent. of the capital stock of the company. It also in the years 1928–29 sold its own capital stock to the public to the amount of approximately $500,000, for which it received cash.

In 1929 the corporation began advancing cash to the company to enable it to extend its business until the corporation had advanced for this purpose, or for the direct purchase of machinery and fixtures, $196,000.

Apparently a management contract was also entered into between the two corporations under which the corporation was to receive $2,500 monthly as a management fee and pay the salaries of the officers of the company, the same persons serving as officers of both corporations.

From January 31, 1929, the close of the fiscal year for 1928–29, up to September 31, 1930, the corporation had charged up against the company as management fees $40,000, making a total charge on his books against the company of $236,000.

It had credited the company during this period up to September 3, 1930, the sum of $37,994.89, $7,500 of which was credited in separate items of $2,500, presumably in payment of three of the monthly management fees, and the balance of the credit being made up of three cash items of $1,070.14, $11,109.88, and $13,864.87, together with credits for 70 shares of "A stock" and 140 "B stock" presumably of the company's capital stock, at a total value of $2,000, and 100 shares of "A stock" and 200 shares of "B stock" at $2,450.

The balance is $198,005.11, for which it now makes claim against the bankrupt corporation.

The proof of this claim before the referee was objected to by several creditors and the trustee in bankruptcy on the ground: (1) That the advances for the purpose of extending the business of the company were not intended as a loan, but as an advance for the purpose of increasing the value of the capital stock of the company held by the corporation; (2) that by a vote of the directors of the corporation on March 18, 1930, the officers of the company were authorized to cancel and did cancel this claim on its books, by transferring as of January 31, 1930, which was the close of its fiscal year, certain sums from its "Good Will" account, an account entitled "Finance," an account entitled "Deferred Charges," and from a "Salary" account, totalling $225,000, to offset charges on the credit side of its "Bills Payable" account; to complete the cancellation on the books of the corporation, an "Investments" account was set up consisting of the items above enumerated, none of which, however, represented tangible assets, but, in the main, expenses that one expert accountant testified should have been charged off long ago; the bills receivable of the corporation were thus balanced, at least to the amount charged against the company; (3) that following this transfer of accounts, the directors of each corporation filed in the office of the department of corporations and taxation at the state house in Boston, certificates as required by law, purporting to show the true condition of its affairs, and a copy of the balance sheet of the company as of January 31, 1930, drawn up by a certified public accountant, was sent to various banks and credit agencies, but which failed to disclose that $225,000 of bills payable of the company had been canceled by the transfers above referred to; that the result of such transfers by both corporations, and the real purpose, was to make a better financial showing for the company and improve its credit standing; that this constituted a fraud on creditors relying on these statements, and the corporation, therefore, was not entitled to prove its claim for these advances on a parity with creditors.

It is urged by counsel for the corporation that these advances created an obligation to repay, since the two corporations are separate entities with different stockholders, and that the act of the officials of the two corporations in canceling the obligation of the company on its books and on the books of the corporation was unauthorized by the

corporation, since it was not shown that the meeting of the directors of the corporation on March 18, 1930, at which the vote was passed authorizing the transfers, was a legal meeting, inasmuch as one director, at least, was not present, and the record does not disclose that any notice of the meeting was sent to him; and that in any event the authorization of the cancellation of a debt by the directors amounted to a gift and was an ultra vires act and did not bind the corporation.

■ The records of the corporation disclose a meeting of its directors on the above date at which three of its four directors were present and voted in favor of the action recorded as taken; and while the records do not disclose that the other director was duly notified of the meeting, no evidence being introduced to the contrary, the presumption is that the meeting was regularly called. Fletcher Ency. Corp., Vol. 3, § 1891; Cook on Corporations (8th Ed.) Vol. III, § 600; Sargent v. Webster, 13 Metc. (Mass.) 497, 46 Am. Dec. 743; Citizens' Mut. Fire Ins. Co. v. Sortwell et al., 8 Allen (Mass.) 217, 223; Ashley Wire Co. v. Illinois Steel Co., 164 Ill. 149, 45 N. E. 410, 56 Am. St. Rep. 187; Kuser v. Wright, 52 N. J. Eq. 825, 31 A. 397.

While proof was offered by one of the directors, recorded as present, that he was not present at the meeting, his testimony was so unsatisfactory that, in the face of the records recording his presence, and of the oral testimony under oath of the clerk who kept the records that he was present, it has little, if any, weight in establishing the invalidity of the meeting.

The action of the board of directors of the corporation in authorizing the cancellation of any obligations there may have been on the part of the company could hardly be classed as a gift, since the success of the company was vital to the preservation of the assets of the corporation, which consisted largely of the capital stock of the company, and the future success of the company depended on its continuing to obtain credit.

We are not prepared to adopt the theory of the directors of the corporation, as outlined by its treasurer, on which the cancellation of the bills payable to the company was justified, viz.: That the advances of cash by the corporation to extend the business of the company involved no liability on the part of the company to repay, but was advanced solely with a view to increase the value of the shares of the company's capital stock held by the corporation, and therefore the bookkeeping entries canceling any obligation shown on the books of the company were proper, at least from an accounting standpoint. Since the corporation held 95 per cent. of the company's stock, such cancellation may or may not have been appreciably adverse to the stockholders of the corporation who had invested in its capital stock upon the understanding that it was organized for the express purpose of assisting the company in expanding its business—provided, of course, the company was successful in its operations—yet as to creditors, relying on statements of the two corporations purporting to show their true financial condition, without disclosing such cancellation, it was clearly misleading.

■ In any event, the filing of the certificates in the office of the department of corporations and taxation, on which creditors have a right to rely, Steel et al. v. Webster et al., 188 Mass. 478, 74 N. E. 686, Felker v. Standard Yarn Co., 148 Mass. 226, 19 N. E. 220, was done by the officers of each corporation authorized by statute to act in the premises, and must be held to be the act of each corporation, and the issuing of a statement of the financial condition of the company in the form of a balance sheet at the close of the fiscal year on January 31, 1930, since the officers of both corporations were the same, must be held to have been done with the knowledge and consent of the corporation. When acts are done by officers of a corporation apparently authorized to perform them, in the absence of a public statute or charter to the contrary, the presumption is in favor of their regularity. The burden is on those who claim the contrary to prove affirmatively otherwise.

If the certificates filed, or the balance sheets issued to the banks and credit agencies on January 31, 1930, had disclosed $225,000 more of bills payable, and only an item of good will and deferred expense accounts to offset them, we think it would have at once invited inquiry by the creditors as to the condition of the company as a basis for further credit, and undoubtedly would have resulted in a contraction of credit, which would have precipitated an earlier bankruptcy; and the canceling of apparent bills payable by the company and of bills receivable by the corporation by the transferring of book accounts of no value as assets, if disclosed to creditors, would undoubtedly have immediately precipitated bankruptcy proceedings.

The controlling issue here, therefore, does not, as we view it, arise solely out of the manner of cancellation of the bills payable

of the company and the bills receivable of the corporation, but out of the acts of both corporations in issuing, by duly authorized officials, statements on which creditors were entitled to rely, that vitally affected the credit standing of the company, and by which several creditors testified they were misled and extended further credit on the strength of the statements issued.

It is obvious that the credit standing of the company was none too good in January, 1929, and the directors of these corporations were not averse to the juggling of figures to improve its financial showing, when they postponed entering on the books of the company the salary expenses for January of that year until February, in order that it might not appear in the balance sheet of the fiscal year ending January 31, 1929; and when they also, at the end of the next fiscal year, made transfers of book accounts wiping out $225,000 of bills payable in the one case and of bills receivable in the other by charging off a part of the bookkeeping assets of good will and certain expense accounts, and treating them as investments by the creditor corporation, it became quite clear that it was not done as a matter of policy, unless the policy was to improve the financial showing and credit standing of the company.

It cannot be regarded other than a deliberate attempt on the part of the officials of both corporations to conceal from the creditors of the operating company, which alone required credit, its actual condition.

The interrelations of these corporations were such as to create a situation under which the courts will look back of the screen of separate corporate entities and consider the substance and not the form in arriving at a just result. Clere Clothing Co. v. Union Trust & Savings Bank (C. C. A.) 224 F. 363; In re Rieger, Kapner & Altmark (D. C.) 157 F. 609, 613. The corporation unquestionably controlled and dominated the affairs of the company. It held 95 per cent. of its stock; its officers were the same; and the affairs of both corporations were so interwoven, and the interests of the stockholders of the corporation were so dependent on the credit of the company, that both corporations must be held to have been participants in the misrepresentations as to the financial condition of the company.

When the duly authorized officers of these corporations elected to treat this ad-

vance or loan as canceled and so represented to the public and to the creditors of the operating company, the corporation cannot now repudiate the position its duly authorized officers took when it filed the certificates in the department of corporations and taxation, and in issuing or knowingly permitting the issuance by the company of a balance sheet to credit agencies and banks to the same effect, and claim in the bankruptcy court that the obligation was not canceled but still exists, and ask to share in the assets of the company on a parity with the creditors it aided in misleading. Felker v. Standard Yarn Co., supra; Steel et al. v. Webster et al., supra.

The following finding of the referee as to the course of events following the filing of the petition in bankruptcy may also have some bearing on the good faith of the corporation in filing this claim: Following a conference between certain banks and the directors of both corporations, "a petition in bankruptcy was filed against the subsidiary company, and on December 1, 1930, the bankrupt made an offer of composition. On the same day the bankrupt filed its schedules. These schedules did not include any liability to the parent company.

"The composition was vigorously opposed. An outsider made an offer for the assets which seemed likely to yield in straight liquidation a substantial increase over the composition figure. Just at this point the bankrupt moved to amend its schedules by adding a claim of $225,000 in favor of the parent company. This was the first intimation, in the whole history of this proceeding, that the parent was the creditor of the subsidiary."

Therefore, whether the advances to the company by the corporation could be treated as a loan or as an advance to increase the value of the capital stock of the company held by the corporation, and could or could not on any theory of accounting be treated as an investment by the corporation, the corporation, after participating in the juggling in the manner disclosed of the accounts of the company, which it absolutely controlled, should not be permitted to share in the assets of the company on a parity with bona fide creditors.

The decree of the District Court affirming the order of the referee rejecting the claim of the E. E. Gray Corporation is affirmed, with costs.