### In re FRANKLIN SUIT & SKIRT CO.

(District Court, E. D. Pennsylvania. June 13, 1912.)

#### No. 4,177.

1. BANKRUPTCY (§ 115*)—POWERS OF COURT—RECOVERY OF PROPERTY BEFORE ADJUDICATION.

A court of bankruptcy has jurisdiction, on petition of a receiver appointed for the estate of an alleged bankrupt, before adjudication, to inquire into the status of property alleged in the petition to belong to the bankrupt and to be under his control but to have been placed in the possession of another as ostensible owner for the purpose of defrauding the bankrupt's creditors; and if, as the result of such inquiry, which may be made by the court directly or through a special master or referee, it should appear that the property is in fact held by the person in possession for the bankrupt, without any real claim of ownership in himself, the court may, by a summary order, require him to turn it over to the receiver.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 165; Dec. Dig. § 115.*]

2. BANKRUPTCY (§ 115*)—FRAUDULENT DISPOSITION OF PROPERTY—RECOVERY BY RECEIVER.

Evidence taken on petition of a receiver considered, and *held* to show that a transfer of property by an alleged bankrupt to the possession of another was without consideration and solely for the purpose of placing it beyond the reach of his creditors, and that it was held for him and in fact remained in his possession.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 165; Dec. Dig. § 115.*]

In the matter of Israel Podolin, Louis Brod, and Benjamin Dein, individually and as partners trading as the Franklin Suit & Skirt Company, alleged bankrupts. On report of special referee. Report confirmed, and order made requiring S. Rudsky, S. Silverstein, and H. Cupersmith to turn over property to receiver.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following is the referee's report mentioned in the opinion:

The special referee to whom by orders dated November 8, 1911, and May 7, 1912, the above matter was referred, to ascertain and report the facts, with the testimony, his findings and recommendations thereon, respectfully reports:

On the 16th day of October, 1911, an involuntary petition in bankruptcy was filed against Israel Podolin, Louis Brod, and Benjamin Dein, individually and trading as Franklin Suit & Skirt Company, and thereafter James B. McGettigan was appointed receiver by the judges.

The receiver by his petition set forth that the bankrupts were formerly in the business of manufacturing suits and skirts at No. 710 Arch street; that when the receiver took possession he found there were not $750 worth of assets remaining on the premises; that from an examination of the estate he found that within 60 days prior to the failure the bankrupts had gone into the open market in New York City and purchased large quantities of merchandise far in excess of their usual purchases, and offered as collateral security the guaranty of a fish dealer in Philadelphia named H. Potamkin, had obtained thereupon shipments of at least $15.000 in value; that the total assets have disappeared; that Potamkin had failed; that under the special reference ordered by the court in an endeavor to ascertain what became of the merchandise so received, Rudsky, a teamster in the city of Philadelphia, and his assistant, Cupersmith, testified at length and in great detail that on August 1, 1911, the bankrupt deposited with Rudsky as collateral security three cases of merchandise valued at $1,541, on which Rudsky advanced $924.62; that on August 8th Rudsky again advanced on five cases of woolens to the value of $2,008.30 the sum of $1,205; and that on August 12th on seven cases of woolens of the value of $2,249.32 Rudsky advanced $1,349.59. The petitioner averred that said testimony was false; the checks having been deposited by the bankrupt in September, 1911.

That Rudsky and Cupersmith further testified that they had made these advances for the period of 60 days, and that when that time expired they sent the merchandise to an auctioneer, and that on October 20, 1911, sold it at public sale after due advertisement for $4,200 to the highest bidder. That neither of them knew the highest bidder, that they had never seen or heard of him before, that they had not seen or heard of him after the sale took place, and that they did not know who he was. They further testified that since the date of the sale neither of them had ever seen the merchandise or knew what became of it. The auctioneer testified that the merchandise was sold for $4,200 to S. Silverstein, the highest bidder. The petitioner averred that Silverstein was in the laundry business, not in the business of purchasing piece goods. The cashier of the auctioneer testified that payment was made for the said merchandise by Cupersmith, the representative of Rudsky, who accompanied Silverstein when the payment was made, and that the payment was made by Cupersmith. He further testified that the check for said payment was a check of the Central Trust & Savings Company to the order of the auctioneer. The treasurer of the Central Trust & Savings Company subsequently testified that the check for $4,200 was drawn by it at the order of S. Rudsky and charged to the account of the said S. Rudsky and check delivered to the said S. Rudsky. That the evidence further shows that the merchandise was removed from the auction house by Silverstein, accompanied by Cupersmith, and that it is still in the possession of Silverstein.

The petitioner averred from the facts as above set forth, and from further evidence that all of the said merchandise belonged to the bankrupt estate, and that neither Silverstein, Rudsky, nor Cupersmith had any right or title in the same, and that the entire transaction was a fraud against the creditors of the Franklin Suit & Skirt Company; that immediate efforts would be made by Silverstein to remove or conceal the merchandise. The petitioner therefore asked for a rule upon Silverstein to show cause why he should not deliver to the petitioner as receiver all of the said merchandise, and that Silverstein, Rudsky, and Cupersmith be restrained from disposing of it. Upon this petition, Holland, J., granted a rule to show cause why Silverstein should not be ordered and directed to deliver to the receiver the goods in

question, a detailed list of which was attached to the petition, and restrained Silverstein, Rudsky, and Cupersmith from in any way disposing of the merchandise.

To this petition Silverstein answered, denying the jurisdiction of the court and averring that he did not have on the 3d of November, 1911, and at any subsequent period, any part of the merchandise, and that it was not in his possession at the present time.

On November 8th the petition and answer were then referred to the special referee, to ascertain and report the facts. On this petition and answer evidence was taken before Referee Amram, acting for the present referee, on November 14th, 16th, and 17th. On November 14, 1911, the receiver again petitioned the court, setting forth that the merchandise referred to in the said petition had been found to be in the possession of Rudsky, and asking that the original petition be so amended as to include a rule to show cause why Rudsky and Cupersmith should not hand over the property to the receiver. The rule was thereupon amended, and it was ordered by the court that any answer to the amended order should be referred to the referee.

Answers were filed by Cupersmith and Rudsky, denying possession, title, or ownership to the property; Cupersmith averring that the property on the day of filing the petition in bankruptcy was not in the possession of the bankrupts nor under their control, and hence the court was without jurisdiction to make the order prayed for. Rudsky averred that on the day of filing the petition in bankruptcy he was in the sole, uncontrolled, and exclusive possession and ownership of the merchandise referred to; that he became the owner of the merchandise in good faith and for valuable consideration; that his ownership was adverse against all the world; that no other person was interested; that he could not lawfully be made a party to the bankruptcy proceedings; and denied the jurisdiction of the court. The taking of evidence was then resumed, and at the close thereof counsel filed briefs with the referee and desired him to proceed to a report thereon.

The evidence was as follows:

Samuel Rudsky, being examined on October 30, 1911, testified that he was in the express business and also kept a storage house. He hauled merchandise for jobbers and manufacturers from the railroad stations to their places of business and back. He had three teams which he kept at 207 Moore street, and his storage house was at Front and Dickinson streets. He had two men at the storage house, one of whom was Cupersmith. He knew Podolin and had business dealings with him. Podolin came to him and said he had a couple of cases of goods to put in storage, and was referred by the witness to Cupersmith, and arrangement was made by Podolin with Cupersmith. Podolin went to Cupersmith, brought the stuff to storage, and then obtained from the witness a loan of 60 per cent. of their value. Checks were then produced by the witness to show the advancements which he made to Podolin. Rudsky declared that he knew nothing of the value of the goods, that they were all handled by Cupersmith, that he relied entirely on Cupersmith as to the value of the merchandise, and that when the notes were not paid the merchandise was sent to the auctioneer and sold. In answer to the question, "When did you sell them?" he said, "Eight or ten days ago," which would fix the date the 20th or 22d of October. Nathan Cupersmith, being examined, testified as to his employment by Rudsky. Being shown the book which contained a record of the goods stored, he testified that the first transaction with the Franklin Suit & Skirt Company was therein as follows: "August 1, 1911, 3 cases merchandise, woolens. Value $1,541.00. Advance $924.62." The entry and all entries in the book were made at the time. The witness did all the writing himself. The three cases of merchandise contained woolen goods, and witness knew they were valued at $1,541 because Podolin showed him a bill for it. The witness looked it over and considered it worth that much money. The witness went to Rudsky and told him to give a check for the amount advanced. No receipt was given to Podolin. Podolin gave them a 60-day collateral note.

The second transaction was on August 8th, on five more cases of woolens, brought to the warehouse by the bankrupt. The value was $2,008.30, upon

which was advanced $1,205; the witness receiving from Podolin a collateral note and the warehouse receipt as before. Podolin showed him his own billhead as to the value of the property. The witness looked at the goods and figured what he could advance on it. The witness was asked, "What experience have you had in the serge business?" He answered, "I can't tell you." The witness had never been in the serge business and had never sold serges; he was in the stove business. The witness testified that he marked each case with a number, and that each case was numbered in black chalk. The three cases received on the first advancement were marked 101, 102, and 103. On the next loan the cases were marked 104, 105, 106, 107, and 108. The entries in the book were made in a blue indelible pencil. The third transaction he testified was on August 12, 1911, and it was written in the book: "August 12, 1911, Franklin Suit & Skirt Company, 7 cases woolens. Value $2,249.32. Advance $1,349.59." Podolin had told him the day before that he was going to send in the goods. The expressman brought them. The witness put them in storage, gave them numbers from 108 to 115, examined them by himself, and made the advancement. The witness produced the bills for the three transactions and three collateral notes dated August 4th, 10th, and 14th, respectively, due 60 days after date, which he alleged to have been given at the time the advances were made. He also produced three storage receipts, dated August 4th, 10th, and 14th. In each of these receipts the case numbers placed upon the cases were contained.

The witness then testified to repeated requests made upon Podolin for the payment of the money, to written notice sent to Podolin, to Rudsky sending the goods to auction two or three days before the sale was made, that the sale was made October 20, 1911, that his counsel arranged for the sale, and that the goods were taken out of their cases and sent to Freeman's in the piece; that the witness put a mark on each piece. "Each piece of cloth was tagged. I put on them the number of the case out of which they came." His next testimony should be quoted at length (pages 122 to 124):

"Q. How was the sale conducted?
"A. They sold it.
"Q. Put up as a whole or in lots?
"A. As a whole, and then sold in lots.
"Q. Which way was it sold?
"A. Sold as a whole.
"Q. Who bought it?
"A. One man bought it.
"Q. What was the man's name?
"A. I don't know the man.
"Q. Were you there at this sale?
"A. Yes.
"Q. Were you there when the man bid on it as a whole?
"A. Yes.
"Q. Did you see the man when he was bidding?
"A. Yes.
"Q. You don't know his name?
"A. I don't know the man at all.
"Q. You never saw him before?
"A. I don't know the man.
"Q. You never saw him before?
"A. I don't know the man.
"Q. Answer my question.
"By referee:
"Q. Did you ever see the man before?
"A. No.
"By Mr. Reber:
"Q. Have you ever seen him since?
"A. No, sir.
"Q. What kind of a looking man was he?
"A. I don't know the man and can't describe him.
"Q. How much did the man pay for the goods?
"A. The goods sold for $4,200.

"Q. $4,200 was paid to Freeman & Co.?

"A. Yes, sir.

"Q. Freeman & Co. paid $4,200 to you, less their commission?

"A. Yes.

"Q. You got the difference?

"A. Yes.

"Q. What became of the goods?

"A. The goods were delivered. I don't know what Freeman did with the goods.

"Q. You never saw the goods since?

"A. No.

"Q. Do you know who has the goods now?

"A. I don't know anything about it.

"Q. Did Mr. Rudsky buy the goods?

"A. No, sir.

"Q. Were the goods ever taken back to your warehouse?

"A. Not that I know.

"Q. If the goods had ever been taken back to your warehouse after the sale, you would have known it?

"A. Not as I know.

"(Question repeated.)

"A. I think I would.

"Q. You never saw the goods there since?

"A. No.

"Q. You don't know who got them?

"A. I don't know the man at all."

Rudsky, being recalled, testified that all Podolin's arrangements were made with Cupersmith; that when Cupersmith said the goods were worth a certain amount he would give Podolin his check for 60 per cent. of that amount. The witness testified that he paid Cupersmith no regular salary, but gave him $50 when he asked for it. To the question, "How much per week have you paid him since he has had charge of this warehouse?" he answered: "I can't tell you how much he took. I guess about $100 or $125." Cupersmith was in the stove business and came up to the warehouse when anybody wanted to put goods in storage.

The auctioneer (George C. Freeman), a member of the firm of Samuel T. Freeman & Co., testified that Cupersmith asked him to see counsel about arranging a sale of woolens. This was on the Saturday previous to the sale. The goods were to be shipped to the auctioneer, catalogued and exhibited, and sold in the usual and ordinary manner. The sale was advertised in the regular way, the goods were brought in a wagon, received on the elevator, and shipped to the second floor. A list of the merchandise was made up, and it was divided into different lots, numbered from 1 to 21 in one account and from 22 to 42 inclusive in the other account. The witness produced a list of the merchandise, and testified that lots 1 to 21 were one of the parcels received by him from Cupersmith, and lots 22 to 42 comprised the other lot which Cupersmith brought in. Cupersmith requested Freeman to mark the goods according to the cases out of which they were taken, and mark 102, for example, meant the case mark.

The goods were offered for sale according to the instructions of counsel, first as an entirety and then separately. The goods were advertised as sold on account of whom it may concern. Lots 1 to 21 inclusive were offered as a whole and brought $1,800. The witness thought that S. Silverstein made the bid. Lots 22 to 42 were then offered as a whole and were sold for $4,200; there being several bidders. Silverstein bought them. The separate bids were less than the bids as an entirety. The witness gave the names of the successful bidders of the individual lots 22 to 42. The auctioneer's book was signed S. Silverstein. Payment was subsequently made by check of the Central Trust & Savings Company to the order of Freeman & Co.

The next witness was Clement J. Craft, treasurer of the Central Trust & Savings Company, who was asked: "About October 20th you drew one of your bank checks to the order of Samuel T. Freeman & Co. for $4,200. Please

explain that transaction, or as much as your records show of it." He answered: "S. Rudsky, one of our depositors, asked us for a bank draft for $4,200. We gave him our draft on the Corn Exchange National Bank and accepted his check in lieu thereof." In answer to the question, "Did Mr. Rudsky ask you to draw that check to the order of Samuel T. Freeman & Co.?" he said, "Yes, he asked our paying teller to draw it to the order of Samuel T. Freeman & Co."

The importance of this testimony will be noted. It is absolutely contradictory to the evidence of Rudsky and Cupersmith, who had testified in full detail that they did not know who the purchaser was at public sale and had never seen the man; that Rudsky had not paid for the goods, had nothing to do with the sale, and had never seen the merchandise since.

Mr. Bryde, the next witness, the cashier of Freeman & Co., testified that he cried the sale of the woolens on October 20th. He had charge of the book signed by the successful bidder; that the name given by the bidder was S. Silverstein, and the book was signed in that name. The witness subsequently received settlement for this lot of merchandise from Cupersmith on the Monday following the sale. The witness was asked why, if Silverstein was the successful bidder, he accepted payment from Cupersmith, to which he replied, "I think as a rule we take for granted, when a man pays for the goods, he is the man to whom they are to be delivered." The same purchaser bought the $1,800 lot of merchandise on that same day, and it also was paid for by Cupersmith. Cupersmith presented in payment a duebill on the Manufacturers' National Bank to the order of Samuel T. Freeman & Co. In answer to the question, "It is your recollection that Mr. Silverstein and Mr. Cupersmith were there together?" the witness replied, "Yes, at the time of delivery, but I don't know that they were together at the time of payment." Further testimony was taken on the subject of this sale from George C. Freeman, who testified that deposits were required from the individual bidders on the merchandise, but none was required from Silverstein, who bid as a whole. In answer to the question, "Why didn't you require a deposit from Mr. Silverstein?" the witness answered, "I don't know just why we didn't, except that I presume we felt Mr. Silverstein wasn't one from whom a deposit was necessarily required." The witness told the bookkeeper that no deposit was necessary from Silverstein. He did this because he was informed that Silverstein would make a bid on the entirety before the sale. This information he received either from Cupersmith or his counsel.

Under the petition of the receiver for rule to show cause, Solomon Silverstein was sworn and testified that his wife conducted a laundry at 1034 South Fourth street. During the year 1911 the witness bought nothing from any auction house in Philadelphia. He had previously bought occasionally at auctions. In 1911 he bought nothing except the goods from Freeman's. The witness testified that he had been sick, but that he saw that they were having a big sale at Freeman's; that he was feeling a little better and thought he would make a few dollars. His son read it to him out of the newspaper. He was accustomed to buy trimmings, serges, and woolens, sometimes shirts. In answer to the question, "Give me the name of a single auction house from whom you ever bought any piece goods in your life," he said: "I can't give you the name, because I didn't keep it; I didn't take it home." To the question, "Tell me the name of a single auction house where you ever in your entire life bought any piece goods," he answered, "I can't remember that." In explanation of his bidding $4,200 and $1,800 for the two lots at Freeman's, he said that a man by the name of Rosenblatt came over to him at the sale and offered to be his partner. Rosenblatt told him: "'We will try to buy the goods, and maybe we will make a couple of dollars, because it is nice goods.' I told him, 'All right.' We started to bid on it, and I bought the second lot for $4,200 on my name. * * * I didn't examine it. He examined it, because he said it was a bargain, to buy it." In answer to the question, "You bid against each other?" he said: "I didn't know he was bidding, and he didn't know I was bidding. There were too many people there for those goods." The witness testified he signed the book but put up no money. When the sale was over, the witness testified that he discovered

from Rosenblatt the goods belonged to Rudsky, and Rosenblatt and he found Rudsky at Third and Market streets that afternoon. The witness testified that he had about $500 in cash with him; that he had $700 more at home, so that he would have had to borrow the rest from friends. He had no bank account, but kept the $1,200 in cash in a safe. When he and Rosenblatt found Rudsky, Rosenblatt said: "Mr. Rudsky, we bought in auction one lot for $1,800 and the other lot for $4,200. That amounts to $6,000. I heard the goods are yours. We will give you some money, and the rest we will give you notes, and we will give you the goods in storage, and we will bring a customer to see the goods. Whenever the goods will be sold to one, two, or three men, you will have your money and we will take our money." The witness testified that Rudsky refused this offer; that he went to see him again on the following day, and finally on the following Sunday Rudsky agreed to pay for the goods with his own check. It is not necessary, in the referee's opinion, to go further in this elaborate and incredible explanation.

According to the testimony of Rudsky and Cupersmith previously cited, checks were given by Rudsky to Podolin at the time the merchandise was stored. The first check was dated August 4th, the next August 10th, and the next August 14, 1911. These checks would correspond with the time that the merchandise was supposed to have been stored. It was proved, however, that the check dated August 4th was deposited on August 26th, check dated August 10th was deposited on the 31st, and the check dated August 14th was deposited on September 2d. Podolin testified to meeting Cupersmith and making arrangements to store merchandise. The goods were sent by an expressman, whom Podolin took from the street, who was not his regular expressman. He had the goods on his shelves. He took them off the shelves, put them in a packing case, filled up the packing case, and sent them down. To the question, "What was in those three cases?" he answered; "I don't remember exactly what. Any goods I had I took from the shelves." He testified that he just took any piece of goods he saw on the shelf and put it in the case until the case was full and then shut it up; that he had no record of the goods which he sent. He was in a great hurry because he was wanting to lend money from Cupersmith. Cupersmith gave him 60 per cent. of the value of the goods. He had to raise the money in August because his bank refused him credit. He had to open a new bank account, and he wanted checks to make a deposit with. The witness testified that he did not use these checks when he received them; he kept them in his pocket. He was asked, "After you carried these checks around in your pocket for some weeks, what did you finally do with them?" He answered, "I was prepared to find another bank to make a deposit in bank and ask for credit." The only bank, however, which he testified he went to, was the Central Trust Company, at Fourth and Market streets, after he had carried the checks around in his pocket for some weeks. He did not go to any other bank, but deposited the checks in his own bank.

This explanation also is in the referee's opinion incredible. The referee finds as a fact that the checks were not received by Podolin from Rudsky until the dates on which they were deposited.

The referee has cited the testimony of Cupersmith that when merchandise was sent to Rudsky's warehouse Cupersmith in each instance marked the case with a number. The three cases on which the first loan was made were marked 101, 102, and 103. The seven cases on which the next loan was made were marked 104 to 110, and the collateral on the third loan was marked 111 to 115. Each collateral note sets forth the numbers of the cases covered as collateral for the loan; the first collateral note referring to cases 101, 102, and 103, and the others in the same way. The auctioneer's testimony as to the condition of the goods when received was to the same effect. Podolin was shown a number of invoices from the creditors, showing merchandise shipped to the Franklin Suit & Skirt Company, and testified that they received this merchandise. Mr. Reber testified that this bundle of invoices was received by him from Podolin. The book of the bankrupt (Exhibit G), containing the record of the merchandise purchased and received by the Franklin Suit & Skirt Company, was explained by the bookkeeper, Podolin's daugh-

ter. The top of each page of the ledger contained the name of the creditor from whom they bought, and the right-hand side of the page referred to the day when the merchandise was received by the bankrupt and its value. Thus, in the invoice of Brown Bros. & Co. (Exhibit No. 2), according to the testimony of the bookkeeper, the ledger showed that on September 28th they received from Brown Bros. & Co. merchandise to the value of $1,105.99. The bookkeeper then identified Exhibit No. 2 as the invoice covering the merchandise so received.

Each one of the invoices thus identified contained a certain number, running from 101 to 115. This number was written with an indelible pencil. These numbers were on the bills when they were received by the receiver from Podolin. For instance, the invoice of the Andrews Mills Company has on the bottom in indelible pencil the number 101. The bookkeeper testified as to this invoice that it was received by the bankrupt on August 24, 1911. It called for 10 pieces, or a total of 726 yards. In Freeman's sale catalogue, lot 23, the description is identical: 10 pieces, 726 yards, case 101. The invoice of the Andrews Mills Company, calling also for 10 pieces or 726 yards, and marked 101, is thus completely identified. This merchandise was received by the bankrupt on August 24, 1911, and it is perfectly evident that the testimony of Rudsky, Cupersmith, and Podolin that case 101 was deposited as collateral security when they made their first loan on August 1, 1911, is absolutely false. The same identification is made of case 103, showing that it was received by the bankrupt on August 31st; and of case 104, showing it was received September 19, 1911. In a similar manner all the invoices are shown to have been received by the bankrupt several weeks after, according to the testimony of Rudsky, Cupersmith, and Podolin, they were deposited with Rudsky as collateral security. It is unnecessary to dwell on the incredible explanations offered by the bankrupts. The discovery of the check from the Central Trust & Savings Company, showing that Rudsky himself obtained it to pay for the goods, sufficiently exhibited the three as perjurers, and each explanation given by them thereafter was incredible and readily confuted.

Podolin also testified to other loans made to him by Rudsky without collateral. This testimony will be found on pages 190 to 195. Then followed the question, "Can you show me in your books the repayment of any moneys you borrowed from Mr. Rudsky?" The witness answered, "I can't tell." The next question was: "I now refer you to page 107 of your cash book, which contains the following item: October 4th, S. Rudsky, $1,000. October 2d, S. Rudsky, $874.35. October 8th, S. Rudsky, $1,151. October 11th, S. Rudsky, $1,221.78. What do those payments represent?" The witness replied, "Those are payments where I borrowed from him money." Taking this testimony in connection with that already recited, the conclusion is irresistible that Rudsky was repaid by those checks the amounts which he was alleged to have paid in August and September on the merchandise of the bankrupt.

The referee finds that Rudsky and Cupersmith conspired with Podolin for the purpose of defrauding the creditors of the Franklin Suit & Skirt Company; that the merchandise set forth in the rule to show cause and shipped by these creditors to the Franklin Suit & Skirt Company was shipped by it to Rudsky's warehouse on dates running from August 24 to September 28, 1911; that checks for 60 per cent. of the value thereof were obtained from Rudsky upon those dates, but were antedated in order to carry out the fraud, and the sums represented thereby repaid by Podolin to Rudsky; that the goods were sent from Rudsky's warehouse to Freeman & Co. and were bought by Rudsky's agent, signing himself S. Silverstein, and paid for by means of a certified check obtained by Rudsky from the Central Trust & Savings Company in exchange for his own check to that institution.

These facts will justify an order made as prayed for, provided that the United States court has jurisdiction of the case; the goods being in the custody of a person denying the title of the receiver thereto and protesting against the jurisdiction of the court. The referee proceeds to consider the question of jurisdiction.

The property to which the rule to show cause refers is in the physical possession of Rudsky, who claims title to it and denies the jurisdiction of the federal court. The rule in such a case has been often stated by the Supreme Court, as well as by Circuit Courts of Appeals and District Courts. The authority of the court of bankruptcy is to determine whether this claim is colorable merely, or is in fact adverse to the bankrupt, and according as it determines that question will it retain or deny jurisdiction of the controversy. First National Bank v. Title & Trust Co., 198 U. S. 280, 25 Sup. Ct. 693, 49 L. Ed. 1051, 14 Am. Bankr. Rep. 102; In re Walsh Bros. (D. C.) 163 Fed. 352, 21 Am. Bankr. Rep. 14; Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, 7 Am. Bankr. Rep. 224; Louisville Trust Co. v. Comingor, 184 U. S. 18, 22 Sup. Ct. 293, 46 L. Ed. 413, 7 Am. Bankr. Rep. 421; In re Teschmacher & Mrazay (D. C.) 127 Fed. 728, 11 Am. Bankr. Rep. 547; In re Glenn (D. C.) 185 Fed. 554, 25 Am. Bankr. Rep. 806; In re Norris (D. C.) 177 Fed. 598, 24 Am. Bankr. Rep. 445; In re Friedman, 161 Fed. 260, 88 C. C. A. 306, 20 Am. Bankr. Rep. 37.

In Mueller v. Nugent, supra, the court made a summary order directing the bankrupt's son to turn over money in his hands which he maintained he should not be called upon thus summarily to surrender when he had it in his individual possession before bankruptcy. The court says: "But suppose that respondent had asserted that he had the right to possession by reason of a claim adverse to the bankrupt. The bankruptcy court had power to ascertain whether any basis for such claim actually existed at the time of the filing of the petition. The court would have been bound to enter upon that inquiry and in doing so would have undoubtedly acted within its jurisdiction, while its conclusion might have been that an adverse claim, not merely colorable, but real, even though fraudulent and voidable, existed in fact, and so that it must decline to finally adjudicate on the merits."

The test is given in Re Holbrook Shoe & Leather Co. (D. C.) 165 Fed. 973, 21 Am. Bankr. Rep. 511, after quoting Mueller v. Nugent, supra: "Manifestly, the statute requires a broader construction, one that not alone authorizes the inquiry by the hearing of testimony, but which also required a decision upon the merits by the referee. This decision may be that the claim is in good faith, but of doubtful validity, or of questionable faith, yet is probably real; and hence that there ought to be an independent suit brought to try the questions; but, if the decision is that the claim is without any actual merit or legal foundation, the referee should regard the property as subject to the jurisdiction of the bankruptcy court, as property of the bankrupt, and should therefore proceed to make an order requiring the actual wrongful holder to surrender to the court or trustee." This decision is in line with all the cases above quoted, with the exception of In re Rathman, 183 Fed. 913, 106 C. C. A. 253, 25 Am. Bankr. Rep. 246, in which Judge Sanborn, of the Circuit Court of Appeals, declared that the test of the summary jurisdiction was whether the court of bankruptcy through the act of its officers had taken possession of the res as the property of the bankrupt. As to this case, it can only be said that it is entirely inconsistent with the decision of the Supreme Court in Mueller v. Nugent and of the Circuit Courts of Appeals and District Courts in the cases above cited, wherein the test laid down was not that of possession of the res, but of whether this possession is colorable merely, or is a bona fide assertion of title, supported by evidence showing that the adverse claim may possibly be valid. In this latter case there is no doubt that the trustee in bankruptcy is remitted to a court having plenary jurisdiction. In re Teschmacher & Mrazay, supra. It is evident, however, that those cases do not apply to a clearly proved conspiracy to defraud the creditors of the bankrupt estate, by the operation of which the physical custody of the goods was put into one of the conspirators, while the control of the bankrupt over them remained.

If the referee's conclusions of fact are correct, the bankrupt Podolin entered into a conspiracy with Rudsky and Cupersmith to defraud his creditors by means which left the three in possession and control of the goods belonging to the bankrupt firm. These goods are in the physical possession of Rudsky, but only as a conspirator. The checks representing his alleged loans

on the property have been repaid, and he is in the position of holding goods for the benefit of himself and his co-conspirators, for which he has paid nothing. It is evident, under these circumstances, that his possession of the goods is merely colorable. The essential element which distinguishes the present case is the existence of the conspiracy and the consequent retention of interest by the bankrupt in the goods.

The referee finds that the claim of Rudsky is colorable only, and that the bankruptcy court has therefore jurisdiction to pass upon the prayer of the trustee's petition.

The referee recommends that the prayer of the said petition should be granted.

The referee annexes the order of court of May 7th. The evidence in the case and the report of the referee under order of November 8, 1911, are on file with the clerk of the court.

All of which is respectfully submitted.

J. Howard Reber, of Philadelphia, Pa., for receiver.

Henry N. Wessel, of Philadelphia, Pa., for S. Rudsky.

J. B. McPHERSON, Circuit Judge. [1] The preliminary question to be determined is whether Skubinsky v. Bodek (C. C. A. 3d Circuit) 172 Fed. 332, 97 C. C. A. 116, 24 L. R. A. (N. S.) 985, 19 Ann. Cas. 1035, forbade the District Court to make the particular inquiry that has just been completed. There were two inquiries, and these must be distinguished. The first, which was unlike the second, began on October 23, 1911. An involuntary petition had been filed a few days before, and a receiver had been appointed. On October 23d he asked for, and obtained, the appointment of a special referee under section 21a of Act July 1, 1898, c. 541, 30 Stat. 552 (U. S. Comp. St. 1901, p. 3431). Proceedings were taken by the referee with the final result that the Court of Appeals, in a short per curiam, reported in Podolin v. McGettigan (C. C.) 193 Fed. 1021, followed Skubinsky v. Bodek, and set aside all that had been done under section 21a. The petition of October 23d is therefore out of the case, and need not be further referred to.

As already stated, the second inquiry—which is now under consideration—is distinct and separate. The petition was presented on November 3d, and asked the court to determine summarily whether certain goods, which were pointed out with precision, were really the property of the bankrupt, and were being withheld from the receiver by a person who was merely the bankrupt under another name. In substance, it was averred that the apparent title to these goods had been juggled with in order to obscure the truth, and that, while other persons might appear on the surface to be the owners, the bankrupt had never really parted with title, but had joined in the trick. It was said that the goods had been shuffled about so as to confuse the situation, but that investigation would show that the present possessor was only the bankrupt under a thin disguise. Objection was made that the court could not undertake even such a rudimentary inquiry in a summary manner, but that the receiver must proceed by plenary suit; Skubinsky v. Bodek being relied upon to sustain this contention. In my opinion that decision is not in point; the Court of Appeals has been careful to distinguish the precise question that is now presented, and

to approve in advance the course that has been pursued in the pending case. All that Skubinsky v. Bodek decides is that a special reference under section 21a is not permitted before adjudication, because the bankrupt's estate is not yet "in process of administration under this act." But the court, evidently foreseeing that inquiries like the present would sometimes be indispensable, said with much significance (172 Fed. 335, 97 C. C. A. 119, 24 L. R. A. [N. S.] 985, 19 Ann. Cas. 1035):

"It doubtless is true that a receiver may be authorized by the act, even before adjudication, to collect and secure possession of moneys and other property belonging to the alleged bankrupt; but such action on the part of the receiver before an adjudication does not constitute or involve 'process of administration under this act.' It is simply gaining control of the estate which is to be subjected to the process of administration, if an adjudication of bankruptcy shall be made."

And this quotation is in entire accord with the decisions of the Supreme Court and other courts to which the report of the special master refers. There is a convenient collection, also, in Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157.

It seems almost superfluous to say that, when the District Court entertained the petition of November 3d, it was not acting under section 21a, but under its general equity powers, reinforced by clauses 3 and 7 of section 2. No one can doubt, I think, that the District Court has power to issue process upon such a petition, and to call before it the necessary parties and witnesses in order to investigate that kind of a complaint directly and summarily. If, as the result of such an inquiry, it should appear that the goods in question are held under a real adverse title, even if such title be founded upon what may seem to be fraud, it would no doubt be necessary to fight that controversy out in a plenary suit; but if there should be no real claim of title, either fraudulent or bona fide, and if the goods should be merely held by a person who is the bankrupt himself in disguise, the court would unquestionably have power to take the goods into its own custody as the property of the bankrupt and proceed to administer them according to law. And what the court could do directly, it can certainly do by the help of a special commissioner, or a special master, or a special referee —the name is of no importance whatever—to whom in the first instance an inquiry may for convenience be committed. To my mind, the question seems to admit of only one answer, although of course others see it differently. The whole subject has been thoroughly discussed, and its principles seem to be well settled. If there is a real adverse title, it must be attacked by a plenary suit; but the court may always inquire whether a title is really adverse, or is a mere sham.

[2] As I think, therefore, the court had undoubted power to undertake the inquiry; and, if this be true, the result will be found in the clear and forcible report of Mr. Hunter, which I adopt (without repeating it) as my own conclusion upon the facts. In a word, the property in question is now, and always has been, the bankrupt's.

And it is therefore ordered that S. Rudsky, N. Cupersmith, and S.

Silverstein, either or all of them, do forthwith deliver to the receiver the merchandise named in the petition of November 3, 1911. And it is further ordered that S. Rudsky pay the costs of this proceeding.