FISH et al. v. EAST (four cases).
TIGER PLACERS CO. v. COHEN et al.
BLUE RIVER CO. v. EAST.

Nos. 1925, 1955, 1968, 2005, 2007, 2023.

Circuit Court of Appeals, Tenth Circuit.
June 29, 1940.

Rehearing Denied Sept. 4, 1940.

Warwick Downing, Richard Downing, and Frederick P. Cranston, all of Denver, Colo., Donald M. Hill, of Boston, Mass., and W. W. Grant, of Denver, Colo. (Donald M. Hill, Jr., of Boston, Mass., on the brief), for appellants.

John W. Shireman and Thos. K. Hudson, both of Denver, Colo. (Norma L. Comstock, of Denver, Colo., on the brief), for appellees.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Six separate appeals, as above numbered and styled, are hereinafter considered and determined.

At date of filing petitions in bankruptcy Richard Downing was vice-president and director of Royal Tiger Mines Company, and also president of the Tiger Placers Company. Warwick Downing and Richard Downing have been attorneys for the Mines Company since 1928. They have represented Fish since November, 1936. They organized the Placers Company, and have represented it since its organization in 1932. The Downings, John A. Traylor, president of bankrupt, and an engineer connected with the Securities Commission of Illinois drafted the contract (October 22, 1932) between the Mines Company and the Placers Company. The Downings and John A. Traylor organized the Blue River Company for Fish and Usher, II, and formulated and drafted the contract between the Placers Company and Blue River Company of August 13, 1937. After said voluntary (bankruptcy) petition was filed (February 26, 1938), and prior to order of adjudication, Fish and Usher, II, attempted to procure the issuance of a sheriff's deed, without succeeding, on the Whatley certificates whereby the Mines Company's property would be conveyed to Fish. Fish purchased the Scott and Whatley certificates a week after the adjudication.

Fish participated in the organization of the Placers Company and was a director of the bankrupt throughout the active business life of the Placers Company. He refused to stand for re-election in April of 1936 and began purchasing claims against the said Mines Company in November, 1936, using the company's attorneys as his attorneys for that purpose. He was a director of the Mines Company during the period in which two of the judgments on which he now bases his own claims were taken against the bankrupt, and the labor claims in the Scott case, represented by the two sheriff's certificates of purchase, were incurred during his directorship. No taxes were paid on the Mines Company's real property after 1928, nor during all the time Fish was a director of the bankrupt, although some money had been available which could have been so applied. Fish purchased the Summit County tax sale certificates on the Mines Company's property outstanding in November, 1936, using in part the bankrupt's money in such purchase.

Another judgment entered on foreclosure of mechanic's liens was assigned to and is still held by Western Development and Realization Corporation, which is the Downings' personal holding company.

John A. Traylor, president of the said Mines Company, until August, 1937, also the president of the Placers Company, was the dominant force in both companies. He was also potentially manager of both companies. At all times during the history of the bankrupt he had sufficient proxies to name the personnel of its board of directors, and this condition existed with the Placers Company until 1935.

Samuel Usher, II, was a director of and in charge of the Boston office of the bankrupt for sixteen years, being its assistant secretary, and also assistant secretary of the Placers Company, as well as director of Blue River Company. He attempted to procure sheriff's deed to Fish on March 1, 1938. Gaspar Bacon was a director of the Placers Company and is now a director of the Blue River Company. Horace Hildreth was vice-president and director of the Placers Company and now director of the Blue River Company.

The directors of the Blue River Company, shortly after its organization, were Fish, Hildreth, Donald M. Hill, Bacon and Usher.

182

The court found that an additional object of making that lease and organizing the Placers Company to receive the grant or demise as lessee was "to hinder and delay creditors" of the Mines Company, direct evidence of such fact being found in the minutes of the meeting of the board of directors of the bankrupt held November 2, 1932, at which a resolution was adopted to, the effect that the stock of the Placers Company should be issued to Edward Cunningham, Erland F. Fish, and John A. Traylor, as trustees for the Mines Company, and the president of the Placers Company, stating that one of the reasons for this arrangement was that it was desired to have the stock "out of the name of Mines Company, so it could not be attached." In re Holbrook Shoe & Leather Co., D.C., 165 F. 973; In re Looschen Piano Case Co., D.C., 261 F. 93; Shapiro v. Wilgus, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128.

At time the Placers Company was formed, no conveyance of property to it—neither deeds nor bills of sale—was delivered, and the contract between the two companies was not recorded until May 21, 1933. Neither change in possession was made nor any such intention indicated.

Under statutes of Colorado relating to conveyances in fraud of creditors, it is provided:

"Every conveyance or assignment in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or of any rents and profits issuing thereupon, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, made with the intent to *hinder, delay* or defraud creditors or other persons of their lawful suits, damages, forfeitures, debt or demands, and every bond or other evidence of debt given, suits commenced, decree or judgment suffered with the like intent, as against the person so hindered, delayed or defrauded, *shall be void.* (G.S., § 1526; G.L., § 1267; R.S., p. 340, § 17; L. '61, p. 245, § 17; R.S. '08, § 2671; C.L. § 5116.)" 1935 Colo.Stat.Ann., ch. 71, § 17. (Italics supplied.)

"Every sale made by a vendor of goods and chattels in his possession or under his control, and every assignment of goods and chattels, unless the same be accompanied *by an immediate delivery,* and be followed *by an actual and continued change of possession of the things sold or assigned,* shall be presumed to be fraudulent

and void, as against the creditors of the vendor, or the creditors of the person making such assignment, or subsequent purchasers in good faith, and this presumption shall be conclusive. (G.S., § 1523; G.L., § 1264; R.S., p. 339, § 14; L. '61, p. 244, § 15; R.S. '08, § 2668; C.L., § 5113.)" 1935 Colo.Stat.Ann., ch. 71, § 14. (Italics supplied.)

"The term *'creditors,'* as used in the last section, shall be construed to include all persons who shall be creditors of the vendor or assignor, at any time *whilst such goods and chattels shall remain in his possession or control.* (G.S., § 1524; G.L., § 1265; R.S., p. 340, § 15; L. '61, p. 245, § 15; R.S. '08, § 2669; C.L., § 5114.)" 1935 Colo.Stat.Ann., ch. 71, § 15. (Italics supplied.)

The fact that Traylor and the other directors of the Mines Company may have honestly believed that large profits could be made by placer operations does not change the illegality of the contract by which they attempted to divert assets of the corporation to the Placers Company away from its creditors. Not only is a conveyance illegal if made with an intent to defraud the creditors of the grantor, but also equally illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. Shapiro v. Wilgus, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128, 131; Means v. Dowd, 128 U.S. 273, 281, 9 S.Ct. 65, 32 L.Ed. 429. The belief, even though reasonably well founded, does not clothe such debtor with a privilege to build up obstructions that will hold his creditors at bay.

In Curran v. Rothschild, 14 Colo.App. 497, 60 P. 1111, the debtor conveyed his property to a corporation in return for its stock, for the purpose of delaying his creditors in enforcing their claims, though not for the purpose of defrauding them in the sense of nonpayment, on the contrary, with an honest belief that by such action the interest of the creditors would be benefited, and without any present or future benefit to himself. The transfer was held to be fraudulent because made with intent to delay creditors.

Under Colorado decisions, a conveyance intended to defraud creditors not only is voidable to existing, but also as to.

future, creditors. A person need not have been an existing creditor at the time the conveyance was executed in order to invoke the protection of the section. House v. Johnson, 19 Colo.App. 524, 76 P. 743.

■ Such intent must be participated in by both parties, grantor and grantee, or mortgagor and mortgagee, but when such is the case, it is settled that the conveyance or mortgage is null and void. Livingston v. Swofford Bros. Dry Goods Co., 12 Colo. App. 331, 56 P. 355.

Whether the intent be to hinder and delay creditors or to defraud them, the legal effect is the same. Italian-American Bank v. Lepore, 79 Colo. 466, 246 P. 792.

■ A sale of property, though for a full consideration, may be void if made by the owner with intent to hinder, delay or defraud his creditors, if the vendee participated in any such intent, and such intent may be inferred from facts and circumstances. Helm v. Brewster, 42 Colo. 25, 93 P. 1101.

■ The right of the trustee as the representative of a creditor under Sec. 70, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e, to set aside the contract as a fraudulent conveyance has not been affected by any statute of limitation, which under Colorado statutes will not begin to run against an action to set aside a voluntary conveyance until the creditor's right has accrued by reducing his claim to final judgment and the return of his execution nulla bona. The fact that he might have sued out a writ of attachment does not affect the matter. Rose v. Dunklee, 12 Colo.App. 403, 56 P. 342.

■ A recorded deed is constructive notice of its contents to all persons claiming what is thereby conveyed, under the same chain of title, but is not notice to other persons. Gillett v. Gaffney, 3 Colo. 351; Rose v. Dunklee, 12 Colo.App. 403, 56 P. 342; Judd v. Robinson, 41 Colo. 222, 92 P. 724, 124 Am.St.Rep. 128, 14 Ann.Cas. 1018.

■ Under Colorado statute a sale by a vendor of chattels in his possession or under his control, not followed by delivery, may be void against creditors of the vendor. Goff v. Landon, 5 Colo.App. 452, 39 P. 69; Baur v. Beall, 14 Colo. 383, 23 P. 345; Goad v. Corrington, 61 Colo. 427, 158 P. 284; Austin v. Terry, 38 Colo. 407, 88 P. 189. Rights of the parties may not be affected by any transfer made subsequent

to the time of sale. Autrey v. Bowen, 7 Colo.App. 408, 43 P. 908; Ray v. Raymond, 8 Colo. 467, 9 P. 15; Bassinger v. Spangler, 9 Colo. 175, 10 P. 809; Sweeney v. Coe, 12 Colo. 485, 21 P. 705; Atchison v. Graham, 14 Colo. 217, 23 P. 876; Allen v. Steiger, 17 Colo. 552, 31 P. 226; Felt v. Cleghorn, 2 Colo.App. 4, 29 P. 813.

■ A sale not accompanied by delivery and followed by actual and continued change of possession may be fraudulent and void as to the creditors of the vendor, notwithstanding such creditors had knowledge of the sale. Helgert v. Stewart, 20 Colo.App. 202, 77 P. 1091; Davis v. Patterson, 69 Colo. 226, 193 P. 662; Bartell v. Griffin, 47 Colo. 569, 108 P. 171; Lloyd v. Williams, 6 Colo.App. 157, 40 P. 243; Willis v. Roberts, 18 Colo.App. 149, 70 P. 445.

■ The recording of a bill of sale is no notice to the creditors of the vendor. Bassinger v. Spangler, supra; Sweeney v. Coe, supra. The Colorado statute admits of no explanation excusing a delivery. Ray v. Raymond, supra; Allen v. Steiger, supra.

■ The vendee must take actual possession and the possession must be open, notorious, unequivocal, and such as to apprise the community that the goods have changed hands, or the sale may be void as to the creditors of the vendor. This statute does not permit the transaction to rest upon the declarations of good faith of the parties. Lloyd v. Williams, supra; Bassinger v. Spangler, supra; Sweeney v. Coe, supra.

■ A case is not taken out of the statute by proving that the sale was in fact bona fide. Bartell v. Griffin, 47 Colo. 569, 108 P. 171.

■ A concurrent or joint possession of vendor and vendee is not admissible. The possession must be exclusive of the vendor. Donovan v. Gathe, 3 Colo.App. 151, 154, 32 P. 436; Cook v. Mann, 6 Colo. 21; Wilcox v. Jackson, 7 Colo. 521, 4 P. 966; Bassinger v. Spangler, supra.

As far back as 1936 counsel for the Mines Company was considering possibility of a bankruptcy proceeding and avoiding judgments by having a friendly stockholder acquire the property by tax deed. In connection with negotiations between Fish's attorney, Donald M. Hill, and Warwick Downing, the effect of bankruptcy proceedings was discussed. Warwick Downing

explained that if bankruptcy was brought about the court would sell all the assets divested of liens, in which event "we" would have first claim to the purchase price amounting to approximately $75,000 and no doubt could acquire the property for that sum.

At hearing upon "Objections and Answers" of the Placers Company, Blue River Company and Fish to the turnover order, held June 2, 1939, before the referee, "further objections" being filed on that day by said appellants, counsel for respondents stated that Fish was the "chief party in interest" and "the chief client" represented by them.

The Placers Company, organized in 1932, was an instrumentality or subsidiary as a means to raise money from the public for the purposes of the bankrupt. Throughout the fifteen years of the Mines Company's existence it had had no material income except from loans and that derived from sale of its stock to the public. In 1931 and 1932 it had raised about $75,000 by the sale of its own promissory notes. In 1932 it could find no purchasers for its stock or its notes. A plan was formulated and adopted that the Mines Company would form a subsidiary corporation, having a financial structure to be dominated by the Mines Company, and give to the subsidiary a contract, substantially in favor of the Mines Company, that would invest the subsidiary with ostensible ownership of the dredge with right to dredge such ground of the Mines Company as was susceptible to operations by placer mining methods. The securities to be sold to the public were to be shares of the preferred stock of the subsidiary, one-half of the proceeds to go to the Mines Company and one-half to the subsidiary, and the subsidiary's common stock to be retained by the said Mines Company, except such as it should deem desirable to give away as bonuses to promote the sale of the subsidiary's securities. The investors in the preferred stock were not to share in the control of the subsidiary unless it failed to pay three consecutive dividends, in which event, the preferred stock was to have voting rights. By retention of the common stock of the subsidiary the Mines Company would be able to dominate the subsidiary. The plan was formulated by counsel for the Mines Company, and said John A. Traylor. The directors were John A. Traylor, Richard Downing, Warwick Downing, Douglas A. Roller, an attorney in the same suite with the Downings, and Floyd J. Wilson, a friend of the Downings. Warwick Downing became its first president and Richard Downing its first secretary.

In lease contract between the parent (Mines Company) and its subsidiary (Placers Company), Trustee's Exhibit 23, it purported to grant to the Placers Company the dredge, including parts of three old dredges, and all the drilling and testing equipment, granting to the Placers Company a "prorating working right" in such machine shops as the Mines Company might thereafter own and maintain upon the Placers Company paying its share of the cost of operation and maintenance, taxes, insurance, wear and tear of the machinery and equipment, depreciation and overhead, and cost of labor and materials used. The Mines Company granted a leasehold interest in and the right to operate by placer mining methods parts or areas of certain of its lode and placer claims, and the right to retain gold and associated metals recovered by placer mining operations, and provided that a map of the affected areas was to be prepared, none of the operation to interfere with or injure any of the operations of the Mines Company, present or future, or interfere with or injure any improvements, structures, roads, ditches, pipe lines, buildings or easements of the Mines Company then or thereafter existing, nor be carried on upon any property of the bankrupt then owned or thereafter acquired, which might be required for the Mines Company's future operations.

The Mines Company assigned to the Placers Company an agreement between it and the town of Breckenridge relating to the operation of the dredge through the town, all options acquired by it or which might thereafter be acquired by it, and agreed to cause John A. Traylor to assign all options held by him on lots and mining claims in the town of Breckenridge, and specifying as to certain property as listed, leased to the Placers Company the use of the Mines Company's water and water rights in such quantities and at such points as would be convenient to both parties, provided such use of the water should not interfere or injure any operations of the Mines Company, and that such use should at all times be subordinate to the use of the water by the bankrupt. The Placers Company was to pay the parent on a

monthly basis a percentage of the gross proceeds or net proceeds to cover payment of taxes on real estate; was required to notify the Mines Company of the discovery of any lode or ore or mineral deposit and agreed to aid and assist in developing or producing the same. The Mines Company had the right to inspect the operations of the Placers Company at all times. The original contract was made for fifteen years, and was later in aid of securing an additional loan extended for an indefinite period.

At the examination under Sec. 21, sub. a, 11 U.S.C.A. § 44, sub. a, held in September, 1939, the following testimony was given: "The Placers Company was organized in September of 1932. It was the child of the Mines Company. At the time of its incorporation, it, of course, had no stockholders. It was formed as an *instrumentality* or *subsidiary* of the Mines Company for the purpose of offering its stock to the public on a basis of a financial set-up created and dominated by the Mines Company. The [Royal Tiger] Mines Company furnished it with the instrumentalities to raise money from the public." (Italics supplied.)

The testimony further showed that the Mines Company and Placers Company were operated as one enterprise, with various forms of securities.

John A. Traylor stated that the general purpose of organizing the Placers Company was conceived to be the shortest way of raising the necessary finances for Mines Company. The only assets of the Placers Company came from the bankrupt, the Placers Company being organized to realize capital for the benefit of the Mines Company. John A. Traylor was president of Mines Company and also as manager dominated both companies. He was always able to procure sufficient proxies to name the directors of the Mines Company, and until 1935 the same condition existed as to the Placers Company, and its control had been through the stockholding of the Mines Company.

The annual statements furnished to stockholders of the Mines Company, issued by its board of directors, refer to the Placers Company as its subsidiary. The Placers Company was regarded by John A. Traylor as being so far the property of the Mines Company that he recommended its sale.

On December 13, 1936, Traylor wrote Usher, II, that the most critical situation concerning both companies was the sale of the property for taxes as the taking up of the three judgments had already been taken care of by two generous and loyal stockholders. When the tax titles were purchased, $500 of the Mines Company's money had been applied thereon.

The preferred stock of the Placers Company was sold and the money used indiscriminately for the purposes of both companies. Checks were passed between the two companies as the purposes of the respective companies required and as John A. Traylor directed. There was a commingling of property, the funds being shifted as required from one company to another. It was stated that they operated under a sort of "brotherly relation," the Placers Company being always "short of money."

Without regard as to which company held the record title to realty, the Placers Company had the right to operate placer deposits and the Mines Company owned the surface and lode rights below the placer deposits. Personal property as to both companies was stored, without distinguishing marks, in a common warehouse in Breckenridge.

Practically all property owned by the Placers Company was the right to extract gold from placer deposits. The area affected by the two companies was never mapped, the operations of the Placers Company being required to be so conducted as not to interfere with the operations of the Mines Company.

In making reports to the taxing authorities the Placers Company always reported real estate standing in its name as that of the bankrupt. This was done so that all contiguous property of the bankrupt could be assessed as one producing mine and result in the assessment of taxes on real estate of the Mines Company on the basis of the production of gold through the Placers Company's operations, at all times the real estate as to both companies being treated as one unit for tax purposes. The Placers Company paid taxes only on the dredge and personal property held by it. The Mines Company paid no taxes after 1929.

When the state of Colorado imposed the sales tax a *dummy account* was set up on the books of the Mines Company, prior to

the effective date of the sales tax statute, showing that the Placers Company owed $10,000, this *being done to avoid Colorado sales tax on property* of the bankrupt used by the Placers Company.

The method of stock selling adopted was to provide money for both companies.

Separate books of account were kept by the two companies, a summary of the transactions being set out in the record (Tr. pp. 569, 570). In order to procure a permit to sell securities of the Placers Company in the state of Illinois the bankrupt company guaranteed the payment of debts of the Placers Company to the extent of $45,000.

The Mines Company extended the Placers Company's contract indefinitely in order that the Placers Company could increase the mortgage on the dredge in the sum of $25,000.

The balance ($1,503.40) left of the $30,000 sent by Fish to Downing on November 16, 1936, was turned over to John A. Traylor for the enterprise, the two concerns being in effect one. (Tr. pp. 84, 85).

The operation of the Placers Company was unsuccessful although gold was mined of a value approximating $120,000. After the money from the sale of preferred stock was exhausted, the company raised $50,000 in addition by mortgaging the dredge, and later increased the mortgage to $75,000, all of which was spent. By December, 1935, the subsidiary was without money and in debt. The Placers Company's active business life ceased in December, 1935. At date of this bankruptcy, the Placers Company had no employees, and its property, except the dredge, was virtually in the hands of Traylor, who was paying watchmen employed by the Mines Company to look after all property, including the dredge, which sank in November, 1937.

After the turnover order of June 3, 1939, three creditors, on June 6, 1939, filed an involuntary petition against the Placers Company, in which East, as bankruptcy trustee of the Mines Company, with leave of court, intervened, praying that his right as to the Placers Company be protected by appropriate order. On August 30th, adjudication as to the Placers Company was made by the District Court, said order being the subject of the appeal in Case No. 2005.

The Placers Company in the spring of 1937 was financially a wreck, about $200,-000 having been spent, but the boat could not run, its operations showing a loss prior to that time. It ceased operating in December, 1935. Between December, 1935, and the spring of 1937, efforts were made to raise new money or make leases. Directors Blake, Bacon and Hildreth attempting to protect the property, out of their negotiations in Boston developed the suggestion by Usher to get Fish to put up the money. Fish came to Colorado in the spring of 1937 to investigate the possibilities in erecting a custom ore mill at Breckenridge, but Traylor (John A.) discouraged him and instead interested him in the placer proposition. Traylor (John A.) gave to Fish all the confidential information at hand in regard to the extent and value of the placer deposits. A verbal agreement was reached between Fish and said Traylor, and Fish began the purchase of equipment for the dredge in May, 1937.

This situation developed the formation of the Blue River Company, a Wyoming corporation organized by the Downings as attorneys for Fish, the directorate of which consisted of persons who were associated with the bankrupt and Placers Company, as follows:

Erland F. Fish, president (director of the bankrupt Mines Company from November 1, 1932 to April 8, 1936); Gaspar G. Bacon, director (a director of the Placers Company during 1936, but resigned as such on August 10, 1937); Horace E. Hildreth, vice-president (director of the Placers Company during 1936, but resigned as such on August 10, 1937); Donald M. Hill, attorney, resident of Boston, Massachusetts, and for years attorney for the Mines Company and also the Placers Company and such attorney at time of the creation of the Blue River Company and continued to act as attorney for the Mines Company and the Placers Company to the date of adjudication of Placers Company as bankrupt, also Fish's personal attorney; Samuel Usher, II, treasurer of Mines Company and for sixteen years its assistant secretary and in charge of its office and that of the Placers Company in Boston, Massachusetts, since April 8, 1936, and now a director of the said Mines Company, and the same Samuel Usher, II, who signed its petition in bankruptcy.

Fish, Hildreth and Usher and counsel formulated a contract (of August 13, 1937) to be executed by the Placers Company, and when they were assured same would

be accepted, Hildreth, Bacon and Usher resigned from the board of the Placers Company and became directors of the Blue River Company.

By the contract, Fish received more than he had asked; Traylor endeavored to put in some means of getting money for the Mines Company, vigorously opposed the contract, refused to sign it and resigned as director and president of the Placers Company. Blue River Company was granted a lease on property and rights granted by the Mines Company to Placers Company under said agreement of October 22, 1932, and other property which the Placers Company had acquired by the right to the fee within the corporate limits of the town of Breckenridge and adjacent thereto, including options, etc. The lease states that persons interested in the pre-organization of the Blue River Company had paid for the benefit of the Placers Company $11,598.20, being amounts due workmen and employees. Blue River Company agreed to pay overdue accounts or liabilities of the Placers Company which in its opinion should be paid to protect and preserve the property leased, "at or before the time that any emergency may arise concerning any such accounts or liabilities," not exceeding a total of $20,000, and to pay not more than $3,000 on options to purchase property, the title of which was to go to the Placers Company, and to pay the expenses of putting the dredge in operation, it being recited that predecessors in interest of the lessee had expended large sums since April, 1937, for such purposes and the lessee should have the benefit of such expenditures. The royalty was to be certain percentages of net profits, ranging from 25 per cent. to 75 per cent., the term of the lease to be for five years. If the total net profits during the term did not equal $600,-000 then the lease was to continue so long thereafter as might be desired by the Blue River Company and not terminate until the total net profits should reach the sum of $600,000. (See Exhibit 11 attached to the Fish deposition and Trustee's Exhibit 28.)

In formation of the Blue River Company, a new corporation chartered with the right to mine, the same general scheme as used in 1932 in organizing the Placers Company was adopted.

Fish, his sister, and Bacon apparently furnished the money, Fish being the principal stockholder and so controlling the company that Hildreth, its manager and one of its directors, thought that it did not make much difference "which was which and had never considered what effect the possibility of Fish's taking title under his certificates of purchase to all the properties included in Blue River Company's lease might have on that company."

Blue River Company had exclusive possession of the dredge and at the date of bankruptcy of the Mines Company was engaged in putting it in operable condition.

In the town of Breckenridge, on land which belongs to the Mines Company, large machine shops are located, called the Tonopah shops, and also a house used as an office as well as a sleeping place for employees which has always been used by the Mines Company and the Placers Company as necessity required. The shops and office and the land on which they stand are the property of the Mines Company, purchased from the Tonopah Placers Company in 1926 or 1927. The Placers Company had the right to use the shops for limited purposes under lease of October 22, 1932. Under the Blue River Company contract that company claimed the right to, and was actually, using the shops, and also was using the office at the date of bankruptcy, when it had a great deal of its surplus materials and machinery stored in the shops, using such shops and office as its business required. The Placers Company was dormant, although a large part of its books and records, as well as the books and records of the bankrupt, were kept in said office at Breckenridge.

The Blue River Company was not at any time in the exclusive possession of the office or machine shops. These were used by the Mines Company to such extent as its purposes required and its watchmen were in charge of all the said bankrupt's property, including the office and machine shops at the date of bankruptcy.

After the decision of the referee on January 28, 1939, the Blue River Company completed the rehabilitation of the dredge and in March was beginning to commence mining operations. The trustee filed a petition for a restraining order to prevent the extraction of gold from the property of the bankrupt, asking that an order be made against Blue River Company, Fish, Hildreth, Warwick Downing, Richard Downing and Frederick P. Cranston, which was heard on March 24th, 1939, and restraining order issued against Blue River Company and Erland F. Fish upon admis-

sion of counsel as to facts of jurisdiction. This order was the subject of petition for review, but before being heard an order was made by the District Judge, on May 3, 1939, permitting the operation of the dredge on terms and conditions, Blue River Company being permitted to make application for reimbursement of its operating expenses, and on July 26, 1939, filed two petitions before the referee relative thereto. The trustee filed his answer and cross-petition and a hearing was had on July 31, 1939. After decision of the referee, his order was the subject of a petition for review and was affirmed, except as to a certain 15% royalty provision, which was stricken. These questions are for determination in Case No. 2007.

Fish was a member of a stockholders' committee which was investigating the affairs of the bankrupt at the time it was about to collapse in 1932. The minutes of September 22, 1932, show that he was sitting as a member of the board, but it is explained that while he was present he was not at that time a director. He was present at the meeting at which the formation of the Placers Company was discussed and became a director of the Mines Company, November 1, 1932 (Stockholders' Meeting Minutes, November 1, 1932, Trustee's Exhibit 11), after Placers Company was formed, and continued to be a director until after Placers Company collapsed in December of 1935. In April of 1936 he refused to stand for re-election as a member of the board of directors, telling Traylor (John A.) that he would be of more service off the board than on it. He assured said Traylor that he would purchase the tax certificates if a favorable price could be obtained and would take no advantage of the company nor of the stockholders.

On November 14, 1936, Warwick Downing wrote to Hill to the effect that large stockholders ought to go together and put up $25,000 to purchase the tax certificates. Consideration was being given at that time to the matter of bankruptcy and the possibility of acquiring all of the assets at a reduced price.

Fish forwarded $30,000 to Warwick Downing two days later with which to purchase the certificates and outstanding judgments. The price at which the tax certificates were offered by Summit County was $25,000; $500 belonging to the Mines Company being then in the county treasurer's hands, a part of the proceeds from certain machinery that had been sold by the Mines Company and removed from the county. The county treasurer had not applied the $500 to the payment of taxes and Downing was successful in having this $500 applied on the purchase of the certificates.

## Summary Jurisdiction of the Bankruptcy Court.

Appellee (trustee) contends that the Mines Company was in actual possession of all the property involved except the dredge boat and contents, the pond on which it floated and the surrounding bank area. The referee found, sustained by substantial evidence, that the actual possession of the property covered by the Fish tax certificates and the judgments, including all the Placers Company ground and lode claims, was in Mines Company, except the dredge boat and contents, pond and bank area, at time of filing petition in bankruptcy. It had been the practice of the Mines Company, concurred in by the Placers Company, to report all the real property in its name to the assessor for taxation purposes, including that standing in the name of the Placers Company.

It not being known how extensive the placer ground was, certain of the claims were to be operated in accordance with direction of the Mines Company. The Placers Company in petition signed by its attorneys on May 27, 1939, states that no question existed as to the jurisdiction of the bankruptcy court over the interest of the property which was included in the agreement of October 22, 1932, consisting of a lessor's interest.

Whatever claim or possession the Placers Company had as lessee, its physical possession and that of the Mines Company was not separated, neither having the right to exclude the other during the life of the lease as long as the Placers Company complied with such agreement. The map probably was not made as agreed not only on account of the cost but also the difficulties involved. As to the possession of certain property consisting of the dredge and such parts of equipment mentioned in the October 22, 1932, agreement, a great amount of machinery, material and equipment located in the machine shops at Breckenridge which is listed in the Mines Company's schedule as its property, and stated to be located in the shops or in the office building, much of this property connected with the lode properties of the Mines Company

is stated to be stored in the machine shops. The Mines Company's schedules included general statements including "all other personal property and fixtures in the yard around the shops, in the assay office, laboratory, and retort house, office, and staff residence." The Blue River Company as lessee of the Placers Company was in the sole occupancy and possession of the dredge at the date of bankruptcy. It was repairing the dredge and also using the shops and office of the Mines Company to such extent as was reasonably necessary for such purpose. Blue River Company had no greater right to the use of these properties than its lessor (Placers Company) had under its contract of October 22, 1932. Neither Blue River Company, Fish, nor the Placers Company was on the date of bankruptcy in the sole and exclusive possession of the shops and office.

The possession by the Mines Company of its property including lode claims, personal property connected therewith or thereon, placer ground, personal property thereon, machine shops and office, and personal property therein, is consistent with the qualified possession for use existing in Blue River Company or Placers Company at the date of bankruptcy.

Fish's right to possession of the lode claims under the tax certificates, sheriff's certificates and transcript of judgment is the same as to all the placer ground and all other property covered by the tax certificates, sheriff's certificates and transcript of judgment.

The evidence without taking into consideration the admission of jurisdiction as of record substantially supports the finding of the referee that actual possession of all the property except the dredge, and personalty with it, the pond and its surrounding bank area, was in the Mines Company at date of filing of voluntary petition in bankruptcy. The undisputed evidence and circumstances in connection with the admissions of record support the finding of the referee as approved by the court as to jurisdiction. The referee in considering all of the evidence heard by him for turnover orders including that not controverted given under Section 21a covering the relationship between the Mines Company and the Placers Company found that it was one enterprise and that the Placers Company was a subsidiary of the Mines Company, its alter ego, organized, controlled and managed for the sole purpose of carrying on where the bankrupt company could not well do so.

Constructive possession may exist where the property is in the hands of the Mines Company's agent or lessee or sublessee or held by one with only a colorable claim, jurisdiction for a turnover order existing. Taubel-Scott-Kitzmiller v. Fox, et al., Trustees, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770; Keaton et al. v. Looney, 10 Cir., 111 F.2d 34.

The bankruptcy court for purpose of determining whether alleged adverse claims are substantial or merely colorable may examine into all the evidence and admissions submitted and as a part of its findings on which conclusion that jurisdiction exists express itself in a qualified sense on the merits of the controversy. Irving Trust Co. v. Fleming, 4 Cir., 73 F.2d 423; In re Eilers Music House, 9 Cir., 270 F. 915, and authorities cited on page 924; In re Franklin Suit & Skirt Co., D.C., 197 F. 591, 600; Cohen v. Hessel, 3 Cir., 278 F. 929; In re Holbrook Shoe & Leather Co., D.C., 165 F. 973.

The referee found, which finding was sustained and approved by the court, that the Placers Company was merely a subsidiary or instrumentality of the Mines Company in the operation of a portion of its business, and that in the operation of the placer ground, the Placers Company, a separate corporation, is an agent of the Mines Company, and its asserted claims to possession and ownership of the Mines Company's property are unsubstantial and colorable only, and that in the agreement of October 22, 1932, as between the two corporations is void as to the trustee as being intended to delay and hinder bankrupt's creditors, there being no such delivery or change of possession of the property as to be effective against creditors of the Mines Company, and all its property, both real and personal, being so commingled that the separating it for purpose of administration or delivery could not be done. In re Looschen Piano Case Co., D. C., 261 F. 93; In re Holbrook Shoe & Leather Co., supra; In re Franklin Suit & Skirt Co., D. C., supra. This finding by referee approved by trial court will not be disturbed on appeal if supported by substantial evidence. Alexander v. Theleman, 10 Cir., 69 F.2d 610; Mullen v. First Nat. Bank of Ardmore, 10 Cir., 57 F.2d 711; Reiss v. Reardon, 8 Cir., 18 F.2d 200.

In September, 1932, John A. Traylor, its president, proposed a plan "to realize capital for the Royal Tiger Mines" which led to the formation of the Placers Company as an instrumentality and subsidiary of the Mines Company, and was dominated by it in the set-up, the said Traylor, the two Downings, Douglas Roller, attorney, with offices in the Downing suite in Denver, Colorado, and Floyd J. Wilson, a friend of the Downings, being directors of the said company.

A contract with the said Placers Company was formulated by said John A. Traylor, the Downings, and a representative of the Securities Commission of Illinois, the bankrupt (Mines Company) guaranteeing the cost of constructing, rebuilding, and enlarging the dredge and putting it into operation, the said Placers Company not to consummate obligations without its consent. (Trustee's Exhibit 11, Minutes, November 2, 1932, p. 174, Tr.)

At that time the bankrupt had options on certain lots and mining claims within the town of Breckenridge, some in its own name and others in the name of John A. Traylor, its president, with expectancy to acquire others (pp. 302, 564, 565, Tr.). These options were afterwards exercised and title to the property taken in the name of the Placers Company with funds provided by the bankrupt (pp. 302, 303, 1 Tr.), which owned the surface and sub-placer rights, the Placers Company having the right to dredge gravel deposits. The officers of the Placers Company who were also officers of the Mines Company reported this property to the taxing authorities for assessment in the name of and as the property of the Mines Company.

In transactions between the two companies, there was no distinct or separate action of the two boards of directors. Money was transferred from one to the other as John A. Traylor directed.

Neither does any of the ground outside of the limits of the town of Breckenridge stand in the name of the Placers Company nor of that included in descriptions in tax certificates purchased by Fish or for Fish in 1936, nor the Summit County tax certificates covering the shops and property in the town of Breckenridge including that which stands partly in the name of the Mines Company (bankrupt) and partly in the Placers Company.

The county assessor's office record discloses that all of the land except as above stated stands in the name of the Mines Company. With respect to this property the officers of the Placers Company, who were also officers of the Mines Company, also reported this property to the taxing authorities as the property of the Mines Company. The minutes of the bankrupt are concisely abstracted in the decision of the referee (pp. 172–180, Tr.). The original Mines Company minute book is Trustee's Exhibit 11, which is not printed in the record but transmitted to the court as an original exhibit. An examination of these minutes discloses that the Mines Company was operating or dominating the business of the Placers Company as its own, and in order that the Placers Company could sell stock in Illinois, the Mines Company guaranteed the payment of certain of its debts (p. 175, Tr.); it was paying commissions to the salesmen of the Placers Company stock; its directors were visiting the property and reporting as to the progress of the rehabilitation of the dredge (p. 176, Tr.); discussions between the Mines Company and Placers Company were had as to the manner of handling inter-company loans of $46,000 (p. 178, Tr.); it was necessary to place a mortgage on the dredge to finance the Placers Company, which was facilitated (p. 179, Tr.); reports were being made to the Mines Company by Placers Company as to the figures and amount of money necessary to put the dredge into sound operating condition; the Mines Company changed the terms of the agreement of October 22, 1932, with the Placers Company so that the mortgage by it on the dredge could be increased to $75,000 (p. 180, Tr.). The minutes as referred to by the referee in his decision bear out the testimony that the two companies were operated "just as one enterprise with various forms of securities" (p. 277, Tr.). The Mines Company was giving away shares of common stock in the Placers Company to stimulate sales by it of preferred stock. The companies were so connected and no map of the area affected by the Placers Company contract was made as required. As late as November 16, 1936, when Downing turned over $1,503.40 of Fish's money, the balance remaining in his hands, no distinction was made between the two companies, it being turned over to John A. Traylor to be used for the Mines Company and/or the Placers Company, as occasion should arise.

Traylor sent $1,000 of same to Usher, II, as payment on account for his use, both

companies being indebted to him. John A. Traylor did not know which company received the benefit of the remainder, money being transferred from one company to another throughout this period as John A. Traylor or Richard Downing directed.

The Placers Company paid accounts of the Mines Company and the latter bought material for the Placers Company. According to the evidence of John A. Traylor "when one company had money they both had money." The personal property of the Mines Company and the Placers Company is commingled without reasonable possibility of identification.

The real estate affected by the contract of October 22, 1932, between the two companies as to the surface and sub-placer rights belongs to the Mines Company. As to the Placer deposits the area of which is not reasonably determinable, the Placers Company holds at most only a leasehold interest as lessee. The Mines Company owns the lode rights in all real estate standing in the name of both companies.

Separate books for the two companies were kept by the same bookkeepers, audited by the same auditors using the same offices and office equipment, the transactions being only nominally different on account of the use of different names, but no actual distinction made between the transactions of one corporation and that of the other. The primary purpose was to raise money for the Mines Company. The business of Mines Company was to exploit its placer deposits and except for a small amount of ground sluicing the Mines Company conducted all its business in the name of the Placers Company.

Corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud. Henry v. Dolley et al., 10 Cir., 99 F.2d 94; Taylor v. Standard Gas & Electric Company, 10 Cir., 96 F.2d 693; Id., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669. The board of each company was at all times made up of members of the dominating group of their employees or their attorneys.

The flexibility of the board members of the Placers Company is demonstrated by the facility by which individual directors got on or off the board when the group's policies and plans required such action. The preferred stockholders finally took apparent control of the board of the Placers Company through Hildreth, Bacon, and Blake after the business of the Placers Company had collapsed, but relinquished immediately that control when Fish's interests required that they act on the Blue River board.

The instrumentality rule here has application. The determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized:

(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

The instrumentality rule in situations similar to that in the instant case has often been applied. Many involved turnover orders and most of them have been repeatedly quoted as authority.[1]

---

[1] Henry v. Dolley et al., 10 Cir., 99 F.2d 94; Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693; Id., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805; In re Muncie Pulp Co., 2 Cir., 139 F. 546; Hamilton Ridge Lbr. Sales Corp. v. Wilson, 4 Cir., 25 F.2d 592; In re Rieger, Kapner & Altmark, D.C., 157 F. 609; In re Lake & Co., D.C., 5 F.Supp. 179; Irving Trust Co. v. Fleming, 4 Cir., 73 F.2d 423; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478; Trustee's System Co. v. Payne, 3 Cir., 65 F.2d 103; Cent. Rep. B. & T. Co. v. Caldwell, 8 Cir., 58 F.2d 721; W. A.

■ In allowing turnover in a summary proceeding, even where separate creditors as to priorities are involved, the issue of recognition of same is not as a rule then determined, though priorities in bankruptcy under equitable principles may be recognized and observed. In re Rieger, Kapner & Altmark, D.C., 157 F. 609; In re Eilers Music House, supra.

■ In Colorado, debtor has the right to remain in possession of real property until sheriff's deeds actually issue, practically the same as under the Ohio Statutes upon which Willis v. Beeler, 6 Cir., 90 F.2d 538, was predicated, and title and possession of the premises remain in the judgment debtor until the sheriff's deed is issued and actually delivered, the sheriff having authority to execute process solely from the statute, acting as a ministerial officer. McArthur, Rec., v. Boynton, 19 Colo.App. 234, 74 P. 540; Manning v. Strehlow, 11 Colo. 451, 18 P. 625; Hayes et al. v. New York Gold M. Co., 2 Colo. 273; Paxton v. Heron, 41 Colo. 147, 92 P. 15, 124 Am.St.Rep. 123; Farmers' Union Mut. Prot. Ass'n v. San Luis State Bank, 86 Colo. 293, 281 P. 366, 66 A.L.R. 1166.

In Willis v. Beeler, supra, it is said [90 F.2d 542]: "The record shows that the company had actual possession of the land, buildings and property in dispute, using it in the conduct of its business at the time of the filing of the petition in bankruptcy. The trustee, ever since his appointment, has had possession in fact of the land, buildings and property. Thus while the proceeds from the sale of the realty were appropriated to the payment of the judgment if and when sale should be made and confirmed, the levy did not confer constructive or actual possession thereof. All of the realty, including the fixtures, therefore passed into the custody of the bankruptcy court upon the filing of the petition."

■■ An adjudication of bankruptcy draws to the bankruptcy court jurisdiction to administer all property of the bankrupt, real and personal, though it may be subject to a valid lien acquired by judgment or the levy of an execution more than four months prior to the date of bankruptcy; and a sale under such lien may be enjoined, and the property sold by the trustee, un-less the bankruptcy court, in the exercise of its discretion, may otherwise direct, as a stay of execution does not interfere with the lien, merely controlling its enforcement. A sheriff having made a levy by virtue of a fieri facias on the goods of the bankrupt more than four months prior to bankruptcy, a venditioni exponas being issued to make a sale, pending which the defendant files a voluntary petition, notwithstanding the validity of the levy, the venditioni exponas must be stayed, it not being essential to the levy that it should be executed, the goods having been drawn into the control of the bankruptcy court. In re Baughman, D.C., 138 F. 742, and In re Vastbinder, D.C., 132 F. 718.

■ See Metcalf v. Barker, 187 U.S. 165, 23 S.Ct. 67, 47 L.Ed. 122, where a creditor's bill, by which not only did the complainant secure a specific lien, but the court in which it was filed obtained direct jurisdiction over the property against which the equity was asserted, it being with reference to such situation that the bankruptcy proceedings may have no effect. In the present case the res is not under such jurisdiction of another court.

In addition, under a stipulation between Fish and the trustee, by the issuance of sheriff's deeds to and in the name of the trustee in bankruptcy, and the deposit of such deeds in the custody of the bankruptcy court, same being made while the referee had the question of his jurisdiction under consideration, the effect of the stipulation and the execution and delivery of these deeds to and in the name of the trustee with the approval of the referee terminated question of state court proceedings. If the state court had any jurisdiction at the date of bankruptcy, it was by this action terminated. In re Kornit Mfg. Co., D.C., 192 F. 392; Wiswall v. Campbell, 93 U.S. 347, 23 L.Ed. 923; In re Hoover-McClintock Motor Car Co., D.C., 1 F.2d 660; Page v. Arkansas Nat. Gas Corp., 8 Cir., 53 F.2d 27, 28; In re Hollingsworth & Whitney Company, D.C., 233 F. 446.

■ The possession lawfully obtained by officers of the bankruptcy court of property claimed by them, drawing to the court jurisdiction of all questions of title thereto or liens thereon, is recognized. In re

Hollingsworth & Whitney Company, supra; In re Robinson, D.C., W. D. Wash., 237 F. 102; Isaacs v. Hobbs Tie & Timber Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645; Straton v. New, 283 U.S. 318, 51 S.Ct. 465, 75 L.Ed. 1060.

"Erland F. Fish enters an appearance and files plea to the jurisdiction of the court to enter the (turnover) order applied for by the trustee. Three days were consumed in taking evidence relating to the subject whether or not the bankrupt was in possession of the property at date of the filing of the petition in bankruptcy, in order to ascertain the probable jurisdiction of the court. 'The attorney for Fish then in open court admitted jurisdiction.' Therefore, the court having jurisdiction is required to consider the petition of the trustee upon the merits based upon the evidence taken at the hearing."

The foregoing recital under record made by referee is under date of November 25, 1938, and marked "Received and filed November 25, 1938 (signed by) Frank McLaughlin, Referee in Bankruptcy."

On November 26, 1938, stipulation between the trustee in bankruptcy, John H. East, Jr., and Erland F. Fish, appears in the transcript as follows: "It is recited that Erland F. Fish is the holder of three (3) Certificates of Purchase, each issued by the Sheriff of Summit County, Colorado, on the 28th day of August, 1937, and the parties desire to preserve and protect the rights of both or either Mr. Fish, or the Trustee, as the case may be, and have deeds issued in accordance with and within the time provided by the act of Colorado, Laws of 1937, page 472. Therefore the parties agree that the said three sheriff's deeds be issued to John H. East, Jr., Trustee in Bankruptcy herein, as stakeholder and stakeholder only, and that a copy of this stipulation, with the approval of the referee endorsed thereon, shall be the request of the parties hereto to issue deeds accordingly. This stipulation shall be without prejudice to the rights of either party and neither party shall be considered as having gained or lost anything by reason hereof, excepting only that it is the intent hereof that deeds may be issued upon said Certificates of Purchase for the protection of the rights and title of Mr. Fish or the Trustee, as the case may be. It is also understood that Mr. Fish does not hereby consent to any jurisdiction of this Court which this Court did not heretofore possess, nor to any enlargement thereof by reason of this Stipulation. Both parties agree that Sheriff's Certificates of Purchase may be withdrawn and surrendered to the said Sheriff for the purpose of carrying into effect this Stipulation. Dated November 26, 1938. (signed) John H. East, Jr., Trustee in Bankruptcy, John W. Shireman, Norma L. Comstock, attorneys for Trustee Herein, Erland F. Fish by Frederick Cranston, his attorney."

The stipulation is marked "Received and filed November 26, 1938 (signed) Frank McLaughlin, Referee in Bankruptcy." (Tr. 103, 104).

The following appears in the transcript as further stipulated:

"It is Hereby Stipulated by and between the Trustee in Bankruptcy herein and Erland F. Fish, as follows:

"That if previous stipulation dated this day between the same parties relating to three (3) Certificates of Purchase issued by the Sheriff of Summit County, Colorado, is carried out and performed by the Sheriff of Summit County, Colorado, and Sheriff's Deed forthwith issued to John H. East, Jr., Trustee in Bankruptcy, both parties agree to save said Sheriff harmless, and release him from all liability for so doing. Dated November 26, 1938. (signed) John H. East, Jr., Trustee in Bankruptcy herein, John W. Shireman, Norma L. Comstock, Attorneys for Trustee in Bankruptcy herein, Erland F. Fish, by Frederick Cranston, His attorney. Approved: Frank McLaughlin, Referee, Received and filed 4 P. M., November 26, 1938. Frank McLaughlin, Referee in Bankruptcy."

On page 105 of the transcript the following appears:

"Order. Upon Motion of Erland F. Fish, It Is Ordered: That memorandum decision dated November 25, 1938, be amended to conform to the facts in the following particulars and in the following language:

"That the sentence in the fifth paragraph of said memorandum decision 'The Attorney for Mr. Fish, then, in open court, admitted jurisdiction' be amended so that as amended the same shall read as follows:

" 'The Attorney for Mr. Fish then, in open court, admitted jurisdiction as to all property of The Royal Tiger Mines Company.'

"Dated at Denver, Colorado, this 1st day of December, 1938. (signed) Frank McLaughlin, Referee in Bankruptcy. Received and filed December 1, 1938. Frank McLaughlin, Referee in Bankruptcy."

On November 7, 1938, the Placers Company stated of record in court that it did not claim ownership of anything except through its lessee, the Blue River Company, to-wit, the dredge boat and other properties belonging to it. (Tr. pp. 63, 526, 527.) The evidence showed that John A. Traylor, president of the Mines Company, was at that time paying watchmen for the purpose of watching all the property, the Mines Company having continuously for many years asserted possession of all such property.

In re Granite City Bank of Dell Rapids, S.D., 8 Cir., 137 F. 818, it was held: "An adjudication in bankruptcy operates as a seizure of the bankrupt's property, by which it is taken in custodia legis wherever situated within the United States, and the title and right of possession pass by operation of law to the trustee, as custodian for the court, at once on his selection and qualification. Whether property is within the district or not is immaterial to affect the exclusive right of the court which made the adjudication to direct its sale, and to determine all claims thereto, on proper notice to the parties in interest, whether they reside within or without the district; the filing of the petition in bankruptcy itself being a caveat to all the world."

See, also, Mueller v. Nugent, 184 U.S. 1, 22 S.Ct. 269, 46 L.Ed. 405; International Bank v. Sherman, 101 U.S. 403, 406, 25 L. Ed. 866; In re Rodgers, 7 Cir., 125 F. 169.

■ Admission of jurisdiction in legal effect admits possession, the Placers Company not claiming ownership or possession of anything but the dredge boat and other properties belonging to it or connected with it, which were not included in the turnover order.

■ Fish was the holder of the tax certificates covering this lode property as well as the placer ground; but by virtue thereof (certificates and transcript of judgment) he had no right to possession nor does the entire transcript of evidence contain any evidence to the effect that at the date of bankruptcy he held possession of any of the property.

■ The acquisition by him in August, 1937, of an assigned judgment to DuPont de Nemours, constituting a lien on the property, neither vested title in him nor entitled him to possession of the property. Farmers' Union Mut. Prot. Ass'n v. San Luis State Bank, supra; Lane v. Morris, 77 Colo. 343, 237 P. 154; Paxton v. Heron, supra; Bailey v. Erny, 68 Colo. 211, 189 P. 18; Carlson v. Howes, 69 Colo. 246, 193 P. 490.

■ In his objection and answer to petition for turnover order, he stated that he employed watchmen at his own expense for purpose of protecting and preserving said properties and by so doing had lawful possession thereof (pp. 63, 64, 65, Tr.), but no evidence, either from him or his employees, Hildreth and Allen, or otherwise, appears in the record, in support of such statement. Though he may have furnished the Mines Company with moneys to protect its properties, such would be in the nature of loans or advances, and not support claim of right to possession. His admission of jurisdiction of the bankruptcy court of all the property of the bankrupt (Tr. pp. 101, 102), disposed of any question of possession by him as to the lode claim and chattels except as same were connected with the dredge. He does contend that the res was in the possession of the state courts and thus that the bankruptcy court had no jurisdiction thereof, which has no support in this record.

There are certain other properties consisting of placer mining claims, both in and outside the town of Breckenridge, the record title to which stands in the name of Mines Company under the agreement between it and the Placers Company of October 22, 1932 (Tr. pp. 562–567), and certain chattel property located thereon, of which the Placers Company claimed to be in possession. In this agreement of October 22, 1932, Mines Company was designated and contract executed as lessor and the Placers Company as lessee. There are also certain other placer claims in the town of Breckenridge, the record title to which stands in the Placers Company, and certain personal property thereon located, of which the Placers Company claims possession. The nature of its possession was stated by the Placers Company in its objection and answer to petition for turnover order (Tr. pp. 62, 63), as follows: "This respondent through its lessee, Blue River Company, is

the owner and in the exclusive possession of a dredge boat and other properties belonging to it, sought to be affected by the turnover order, and has been the owner and in continuous and exclusive possession of same since October 22, 1932; that the major portion of its property was conveyed to it under an agreement dated October 22, 1932, and recorded May 21, 1933, in Book 122 at page 96 of the records of the County Clerk and Recorder of Summit County, Colorado; * * *".

The referee found that the actual possession of the property covered by the Fish tax certificates and the liens by virtue of the judgments was in the Mines Company at the time of the filing of the petition in bankruptcy. The tax certificates held by Fish covered all the placer ground as well as the lode claims as it had been the custom of the Mines Company and Placers Company to report all the real property to the assessor for taxation purposes in name of bankrupt (Tr. pp. 300, 302, 317, 391, 444, 566), including that standing of record in the name of the Placers Company, assessed in name of Mines Company. As to such property standing in the name of the Placers Company, it was acquired and title taken for the benefit of Mines Company under the options provided for in the terms of the Placers Company agreement of October 22, 1932 (Tr. 564), the money being derived from Mines Company through the sale of its stock in the Placers Company (pp. 302, 303, Tr.), and Placers Company claimed possession only as stated in its response as to the Blue River Company. Said contract provided that the Placers Company was granted a leasehold interest in and the right to operate parts or areas of certain of the claims, and the right to retain gold recovered by such operations provided that a map was to be made, which was not done, and provided that the operations of the Placers Company should not interfere with any operations of Mines Company, or interfere with or injure any improvements, structures, etc., then or thereafter existing, nor be carried on upon any property of the Mines Company, then or thereafter acquired, which might be required for its future operations (Tr. p. 564). Mines Company was to retain the lode rights below the placer deposits and all surface rights; it was not known how extensive the placer ground was, and certain of the claims were to be operated in accordance with directions of Mines Company. (Tr. pp. 391, 563, 565.)

The Placers Company in petition signed by its attorneys on May 27, 1939 (Tr. pp. 526–529), states that there is no question as to the jurisdiction of the bankruptcy court over the interest in the property which was included in the agreement (October 22, 1932), said property consisting of a lessor's interest; previously in its answer and objections to petition for turnover order (Tr. pp. 62, 63), it is implied that parts or all of this property was granted to it by the October 22, 1932, agreement. Examination of the document or agreement itself and of the evidence with relation to the occupation, use and treatment of the ground for tax purposes, supports the contention of the trustee. Whatever claim of possession the Placers Company had was (Tr. pp. 526–529), as lessee. The physical possession of the lessee and that of the lessor in this real property as long as it continued under said agreement cannot be separated, neither having the right to exclude the other. The reason the map was never made, obviously, was on account of the expense and the difficulty in making same (Tr. pp. 445, 506, 507).

The Placers Company also claims now to have been in the actual possession of certain personalty, including the dredge and dredge parts, as well as certain other equipment mentioned generally in the October 22, 1932, agreement. There is an amount of machinery, material, and equipment located in the machine shops at Breckenridge, which is scheduled (schedule signed by Downing) as property of Mines Company, and stated to be located in the shops or in the office building. Much of this property came from the lode properties of Mines Company and is stated to be stored in the machine shops. These schedules contained general statements including "all other personal property and fixtures" in the shops, in the yard around the shops, in the assay office, laboratory and retort house, office and staff residence. All this personal property is commingled and unmarked so as to be indistinguishable as property of Mines Company or property of the Placers Company.

There appears to be no question that the Blue River Company, as lessee of the Placers Company, was in the sole occupancy, and possession of the dredge at the date of bankruptcy, at which time it was repairing the dredge and using the shops and office only to such extent as was reasonably necessary to the repairing of the dredge. Appellants contend that Mr. Shireman, attor-

ney for appellee, in effect admitted that Blue River Company was in the exclusive possession of the shops and office.

The evidence of A. P. Stuard was in part as follows (Tr. p. 521):

"Q. You have observed the operation of this dredge boat. Do you know who is in possession now of the dredge boat? A. I suppose the Blue River Company because the checks of the fellows working are signed by the Blue River Company.

"Q. You have seen a number of checks on the pay roll for the operation of the dredge boat? A. Yes.

"Q. Do you remember on February 28, 1938, who was in possession?

"Mr. Shireman: There is no question as to that date, The Blue River Company was there.

"Mr. Cranston: It may be stipulated then that the Blue River was in possession of the dredge boat on February 28, 1938?

"Mr. Shireman: That is right. In actual possession and repairing the dredge boat at that date. In the shops and office."

That was during the examination of the witness, the statement being made as to what his evidence would be and not as to stipulation of legal effect that they were in possession as exclusive, absolute owners. The Blue River Company was in possession under its contract.

In the record as Trustee's Exhibit 28, denominated a lease, the Placers Company therein called the lessor, and the Blue River Company as lessee, it is recited that the lessor owns a dredge boat and other property used and necessary in connection with the operation and maintenance of its said dredge boat, and has "granted, demised and let, and by these presents does grant, demise and let for mining purposes unto the said lessee all of the above described property, together with any real estate hereinafter acquired, together with all appurtenances, together with any and all other property and rights granted to the lessor under said agreement between the lessor and the Mines Company hereinabove referred to."

Fish's attorneys, in open court, at conclusion of the hearing on the turnover order,

admitted jurisdiction as to all property of Mines Company, and all appellants admitted jurisdiction on May 17, 1939, by written petition in which they stated that at no time had there been any question of the jurisdiction of the bankruptcy court over the property of Mines Company nor any question as to the jurisdiction of the referee over Mines Company's interest in the property which was included in the October 22, 1932, agreement constituting lessor's interest in the real property described therein.

In case No. 1925 orders of the District Judge of May 18, 1939, and June 1, 1939, nunc pro tunc, affirmed referee's order of January 28, 1939, holding that the bankruptcy court had jurisdiction of Mines Company and summary jurisdiction of the claims against Mines Company, to-wit, the claims of Fish and John B. Traylor, and the lease from Mines Company to the Placers Company and summary jurisdiction as to property of Mines Company claimed at any time by the Placers Company, and denying pleas of Fish and the Placers Company as to bankruptcy jurisdiction, and sustaining the plea of Blue River Company as to the bankruptcy jurisdiction as to its franchise as a corporation, and the dredge boat and its contents, and the pond and its surrounding bank area, and otherwise that the turnover order should be granted unconditionally against Fish and the Placers Company, and unconditionally against Blue River Company with the stated exceptions.

Case No. 1955 is as to an action by Fish against trustee East in which Fish prayed that the property be adjudicated in such civil action to be his and East as trustee directed to convey same to him and title thereto be quieted in him. A motion to dismiss the action having been filed by the trustee was sustained by the court. Fish amended his complaint, the trustee renewed his motion to dismiss which was sustained by the court and Fish stood on same as amended and the action was dismissed, and the court held that the bankruptcy court not only had jurisdiction as to property involved in that action, but also jurisdiction as to the claim of Fish[2] in

---

2 Tr. in No. 1925, p. 20, Proof of Debt Due Individual (Secured and Unsecured): " * * * Erland F. Fish * * * made oath and says that The Royal Tiger Mines Company, the corporation by whom

a petition for adjudication of bankruptcy has been filed, was at and before the filing of said petition and still is justly and truly indebted to said deponent in the following sums: A. * * * B.

which a lien was sought on the rem, the controversy between Fish and trustee East relative thereto being retained in the bankruptcy court for future consideration. The question involved is whether Fish can commence and maintain such civil action in the District Court for the determination of controversies which at that time are being litigated in the same court as a court of bankruptcy. In framing his complaint against trustee East, Fish exhibited portions, but not all, of the record in the bankruptcy proceeding, the action commenced being in the same court where the bankruptcy proceeding is pending. The trustee proceeded directly to file a motion to dismiss, attaching to his motion as exhibits portions of the record in the bankruptcy proceeding omitted by plaintiff Fish which disclosed as to whether Fish had a claim on which relief as prayed for by him could be granted in such civil action. Such record in the proceeding in the bankruptcy court was that at date of filing petition in bankruptcy, the bankrupt had possession of the property in controversy, not only had title thereto, but also at the time when Fish commenced his civil action, such title was in trustee East under sheriff's deed issued to him pursuant to stipulations between the parties as made in the bankruptcy proceeding and approved by the referee. See copies of date, November 26, 1938, as herein, supra, set out (pp. 42–44).

The record disclosed that the sheriff's deeds, as well as the title sought to be quieted in him, which he seeks to obtain were then in the possession of and jurisdiction of the bankruptcy court.

As to the court's jurisdiction and power to adjudicate all such matters and as to the court's jurisdiction, see In re Tax Service Ass'n, 305 U.S. 160, 59 S.Ct. 131, 83 L.Ed. 100; Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770; May v. Henderson, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870.

At the hearing on trustee's petition for a turnover order, the existence of an agreement under which Fish purchased the certificates under arrangement with Mines Company, or its representative, was proved and the referee held that Fish had no right to the property itself, but only to establish claim based thereon. Fish in filing such attested claim in the bankruptcy court ad-

* * * C. * * * D. * * * E.
* * * F. * * * G. * * * H.
* * *. That said claim is not a pre-

mitted the existence of such an agreement in that he swore that the bankrupt was indebted to him, attaching the sheriff's certificates and assigned judgments to his claim as evidence of the debt, seeking a preference or priority.[3]

In considering the trustee's motion to dismiss, the District Court took judicial notice of its own records for the purpose of determining what matters relative to such matter had been considered by the bankruptcy court, what decision had been made and what was for future disposition in the bankruptcy court. Thompson v. Maxwell Land-Grant & Ry. Co., 168 U.S. 451, 18 S.Ct. 121, 42 L.Ed. 539; Bienville Water Supply Co. v. City of Mobile, 186 U. S. 212, 22 S.Ct. 820, 46 L.Ed. 1132, 1133; Egan v. Hart, 165 U.S. 188, 17 S.Ct. 300, 41 L.Ed. 680.

The jurisdiction of the bankruptcy court to adjudicate the controversies growing out of the agreement between Fish and the trustee as filed with the court is controlling and exclusive, and may neither be surrendered nor control over such matter confided to a different tribunal. United States F. & G. Co. v. Bray, 225 U.S. 205, 32 S.Ct. 620, 56 L.Ed. 1055.

The complaint as amended stated no facts entitling plaintiff to relief in that it shows no right in Fish to institute the civil action, no jurisdiction in the court outside of the bankruptcy jurisdiction to grant the relief for which prayer was made, nor leave obtained to institute such action. The controversy between Fish and the trustee in the respects raised by the civil action rests exclusively in the bankruptcy jurisdiction and could be tried only in the bankruptcy court. The contention of Fish based on rights which might have been raised by him in another jurisdiction of the court had not jurisdiction of the bankruptcy court attached, or had no such agreement been made between him and the trustee East as approved by the referee as to trustee East's acquisition of the sheriff's certificates of purchase, etc., cannot now be heard in a civil law action.

In Case No. 1968 is involved an order by the District Judge of August 4, 1939, in which he affirmed order of referee of June 3, 1939, wherein the referee directed the Tiger Placers Company, Fish, and Blue River Company to turn over to the trustee

ferred claim except for the principal sum of $86,060.54."

3 See note 2, supra.

and impound with Richard Downing books containing minutes of stockholders' and directors' meetings, stock books, account books, and property and books of the Tiger Placers Company and the Blue River Company, and the same as to Richard Downing of Denver and Horace E. Hildreth of Breckenridge for inspection and making copies thereof by East as trustee in bankruptcy, and to turn over all properties to said trustee belonging to the Mines Company which is held by them "except that said Blue River Company may retain possession of that certain dredge located in the Town of Breckenridge, Summit County, Colorado, and known as the Tiger Dredge No. 1," and also such real estate owned by or claimed by the Mines Company or the Placers Company, as therein specified.

 Appeal Case 2005. Within a few days after the referee entered the order directing the Placers Company and the other respondents to surrender to the trustee of the Mines Company the said assets, involuntary petition in bankruptcy on the part of Harry Cohen, doing business as Samuel Cohen Company, Frank Stafford, and Carl A. Kaiser, not parties to any of the proceedings of the Mines Company bankruptcy matter, was filed against the Placers Company, in which John H. East, Jr., as said trustee, intervened.

A petition for stay of proceedings upon said involuntary petition was denied, and trial was had on the merits.

The involuntary petition alleged the commission of two acts of bankruptcy, one on the third ground, later withdrawn, and the other being the fifth ground set forth in Section 3, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 21, sub. a. The fifth ground relied upon, that the entry by the referee of the order directing the Placers Company to surrender its property to the trustee of Mines Company constituted the suffering involuntarily by it of the appointment of a trustee to take charge of its property.

The pertinent portion of the order is as follows: "* * * said The Tiger Placers Company is ordered and directed forthwith to surrender and turn over to John H. East, Jr., as trustee in bankruptcy of The Royal Tiger Mines Company all of the property described in the subjoined list which it has in its possession or under its control; and also any and all other property of the Royal Tiger Mines Company and The Tiger Placers Company which it has in its possession or under its control, wheresoever the same may be, and whether or not the same be described in said subjoined list; * * *."

It is admitted that the claims of these petitioning creditors are sufficient in number and amount, that the Tiger Placers Company is such a one as may be adjudicated a bankrupt, and that at the time the petition was filed it was unable to pay its debts as they matured.

The other appellee, John H. East, Jr., as such trustee in bankruptcy of the Mines Company, and as such intervenor claims possession of the property of the Placers Company. The background is interesting and instructive only as explaining the appearance of the appellee East, trustee, herein as intervenor.

The findings on which the turnover order was based are that the Mines Company and the Placers Company are alter ego of each other, and constituted but one business enterprise, and that the Placers Company was organized and a lease made to it as lessee for the purpose of hindering and delaying creditors of the Mines Company.

The turnover order requiring the Placers Company to surrender the property was made June 3, 1939. The time within which creditors could file claims in the Mines Company bankruptcy proceedings expired on September 2, 1938, nine months prior to the making of the turnover order. The creditors' petition was filed against the appellant June 6, 1939, three days after the turnover order was made.

The language of Chapter 3, Sec. 3, sub. a (5) of the Bankruptcy Act, 11 U.S.C.A. § 21, sub. a(5), provides: "* * * While insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property; * * *."

In Duparquet Huot & M. Co. v. Evans, 297 U.S. 216, 56 S.Ct. 412, 80 L.Ed. 591, the matter arose under the provision of Section 77B of the Bankruptcy Act 11 U.S.C.A. § 207, which permitted an involuntary reorganization petition to be filed if a prior equity receivership was pending against the debtor. It was there held that such receivership must be a general one for liquidation or for cognate purposes, and must be

general as contrasted with a receivership incidental to the enforcement of a lien.[4]

In directing the property claimed by the appellant to be turned over to East, as trustee, this was after the referee had found that the two companies were entirely identical, alter ego of each other and so constituted as doing business under two organizations and both names, and that the parent company organized the subsidiary, the Placers Company, in order to hinder and delay creditors of the Mines Company. Creditors of the Placers Company that had been accumulated in the meantime may have the right to elect their own trustee and proceed under such rights as may be available by intervention.[5]

Creditors of the Placers Company, though it be an instrumentality of the Mines Company, may be entitled to be paid from the Placers Company in preference to the claims of the Mines Company. Such questions may be raised[6] and protection sought.

█ Case No. 2007. Paragraph 3 of the lease of August 13, 1937, is a demise from Placers Company direct to the Blue River Company to have and to hold for a definite period, and by paragraphs 4 and 4-g the Blue River Company was to comply with all the terms and conditions of the lease of October 22, 1932, from the Mines Company to the Placers Company and under paragraph 6 thereof a royalty plan was worked out which would restore 75 per cent. of the operating proceeds to the Placers Company. On January 28, 1939, the referee in bankruptcy, in his finding and order, said: "The validity of the Blue River lease, as to the bankrupt's property, depends upon the validity of the contract held by the Placers Company which herein has been found (in cases 1925 and 1968) to be void as against the creditors of the bankrupt, and was void as against the creditors of the bankrupt and was void as to the successor in interest who had knowledge and notice of that invalidity. That includes the Blue River Company." (Case on appeal No. 1925, Tr. pp. 209, 210.)[7]

The machine shops and office were included in the property ordered to be turned over to the trustee. The modification of the order of May 3, 1939, was by adding the additional provision: "That at the time that this Order and Decree remains in full force and effect and the said Horace E. Hildreth is absent from Summit County,

---

[4] Standard Accident Ins. Co. v. E. T. Sheftall & Co., 5 Cir., 53 F.2d 40, 19 A. B.R.,N.S., 49; Bramwell v. United States Fidelity & Guaranty Co., 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368; In re International Coal Mining Co., D.C., 143 F. 665; Adams v. United States, 9 Cir., 24 F.2d 907; Walker v. Morgan & Bird Gravel Co., 5 Cir., 20 F.2d 547.

[5] Oriel v. Russell, 278 U.S. 358, 49 S. Ct. 173, 73 L.Ed. 419; Farmers' & Mechanics' National Bank v. Wilkinson, 266 U.S. 503, 45 S.Ct. 144, 69 L.Ed. 408.

[6] Carroll v. Stern, 6 Cir., 223 F. 723.

[7] In the finding and order of the referee it is also said:

"The plea to the jurisdiction as to the Blue River Company is sustained in the following particulars:

"1. As to the franchise and rights of the Blue River Company as a corporation.

"2. To the Dredge boat, which was in the possession of the Blue River Company at the date of the filing of the petition in bankruptcy and to which for that reason summary jurisdiction does not attach.

"3. To any property of the Blue River Company which is not described either directly or indirectly in the lease from the Tiger Placers Company to the Blue River Company, dated August 13, 1937.

"4. To the real property upon which the dredge boat is actually now floating, whether the same is, or is not covered by the lease agreement of August 13, 1937, for the reason that that limited area of ground was in the actual possession of the Blue River Company, connected with its actual possession of the dredge boat.

"The pleas to the jurisdiction of the Blue River Company as to all other property which it claims to have acquired from the bankrupt company or the Tiger Placers Company ought to be overruled and denied, for the reason that that property was not, at the date of the filing of the petition in bankruptcy, in the possession of the Blue River Company, but is in the possession of the bankrupt and/or its subsidiary.

"Any claim to that property which the Blue River Company claims against the creditors of the bankrupt is colorable and invalid.

"The petition of the trustee for the 'Turn Over' order against the Tiger Placers Company and as against Erland F. Fish ought to be granted unconditionally.

"The petition of the trustee for a 'Turn Over' order against the Blue River Company is denied as to the exceptions hereinabove stated and ought to be otherwise granted unconditionally."

Colorado, then Tom E. Allen may and shall be employed by the said Blue River Company as superintendent, and as such shall be custodian of Blue River Company and/or Trustee of the gold and silver amalgam and gold nuggets, as hereinabove provided, and during the absence of the said Hildreth, have and be subject to all of the rights, duties and liabilities granted to or imposed upon the said Horace E. Hildreth by the terms hereof."

And further that:

"Except as herein expressly modified or amended, the said Order and Decree of May 3, 1939, shall continue in full force and effect according to its terms until the expiration thereof or the further Order of Court.

"Dated June 14, 1939."

After this order was made certain reports and maps appear to have been filed in the office of the referee, but not admitted in evidence nor considered. On pp. 20 to 24 of the transcript relating to appeal in case No. 2007, an application appears to have been filed on August 2, 1939, with the clerk of the District Court to disqualify the referee. A hearing on petitions for reimbursement of the Blue River Company was held on July 31, 1939. The transcript does not disclose that said application to disqualify was either heard or passed on by the District Judge. On July 26, 1939, Blue River Company filed two petitions for reimbursement. On same day the trustee filed his answer and cross-petition. The matter was heard on July 31, 1939. Disputes concerning the ownership of the ground upon which the dredge operated were considered. Upon conflicting evidence the referee fixed the rate of compensation for the shops at $15 per day and authorized the trustee to amend his answer, and on August 4, 1939, an amendment was filed in which he asked compensation for the use of material after date of bankruptcy and prior to May 9, 1939, and that 15 per cent of the net mint returns from gold be retained in the registry of the bankruptcy court until the actual ownership of the premises be determined. On August 4, 1939, nunc pro tunc order was entered setting over to the trustee $3,050 as general funds of the bankruptcy estate, allowing compensation for the shops at a rate of $15 per day and directing the reduction of 15 per cent. of the net mint returns from the sale of gold

in a special fund to be set up as "Tiger Dredge No. 1 Royalty Fund," none of which was to be expended except upon further order of the court. Petition for review was filed by Blue River Company and upon hearing thereon the District Judge affirmed the order, except as to provision relating to the 15 per cent. royalty which was eliminated. The finding as made by the referee was upon conflicting evidence, being affirmed by the District Judge, and being supported by substantial evidence may not be set aside here on review.

 As to disqualification of the referee, under 28 U.S.C.A. § 25, for the disqualification of judges, affidavit must be filed not less than ten days before the beginning of the term of the court or a good cause shall be shown for failure to file it within such time. United States v. Parker, D.C., 23 F.Supp. 880. The application was filed with the clerk of the District Court on August 2, 1939, the hearing to which it related having been held on July 31, 1939. The opening term of the District Court was May 2, 1939. The referee had already made findings and announced order as to the petition for reimbursement. Such written order nunc pro tunc was signed on August 4, 1939 as of July 31, 1939. The referee is not a judge within the meaning of § 1(20) of the Bankruptcy Act, 11 U.S.C.A. § 11(20) and of § 21 of the Judicial Code, 28 U.S.C.A. § 25. The referee is an officer of the bankruptcy court appointed and removable only by the judge of the United States District Court. § 1(22) and § 34(1), Bankruptcy Act, 11 U.S.C.A. §§ 1(22), 62(1). The District Judge may also at any time for cause transfer a case from one referee to another. § 22, sub. b, 11 U.S.C.A. § 45, sub. b, Bankruptcy Act. There appears to be no rules either of said district, or in the rules of civil procedure, or in the general orders, relating to the removal or disqualification of referees. A party aggrieved by an order of the referee may file a petition for review. § 39, subs. a (10), c, Bankruptcy Act, 11 U.S.C.A. § 67, subs. a(10) c. The assignment of error as to the application to disqualify the referee must be overruled.[8]

 As to whether the bankruptcy court had power to withhold money deposited by Blue River Company and place the same in the general funds of the bankruptcy estate, to be held by the trustee, §

8 Ex parte American Steel Barrel Co., 230 U.S. 35, 33 S.Ct. 1007, 57 L.Ed. 1379; Henry v. Speer, 5 Cir., 201 F. 869.

68, sub. a of the Bankruptcy Act provides: "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."[9]

The bankruptcy court was vested with the possession of the assets of the bankrupt as of date of filing petition, with power to prevent depletion. Whether the money set over to the trustee to be held in the general funds of the bankruptcy estate may be used to pay the expenses and fees of litigation with the appellant is within the jurisdiction of the bankruptcy court. It does not appear that though the fund has been set over to the general funds of the bankruptcy estate that the same has been illegally used. The order permitting the operation of the dredge pending appeal as made by the bankruptcy court under its limitations does not appear to be an abuse of its powers.

■■■■■ Case No. 2023. As to order made by the District Judge on October 25, 1939, denying Fish's request to withdraw exhibits to claim theretofore duly filed for lien on property in possession of the bankruptcy court, and being in the files of the bankruptcy court, but on his request being permitted to withdraw his claim or so much thereof as he desired and the holding that the trustee in bankruptcy by virtue of Fish's withdrawal of his claim for a lien on property then in custody and jurisdiction of the bankruptcy court could cause such property to be sold in bankruptcy free and clear of all liens and encumbrances, including the lien of Fish as claimed, is without error.[10]

The judgments in cases No. 1925, 1968, 2023, 1955, 2005, and 2007 are affirmed.[11]

On Petition for Rehearing.

PER CURIAM.

■■■ Counsel for appellants have filed a petition for rehearing in which they assert that the opinion of the court leaves Erland F. Fish without remedy for the funds advanced by him for the bankrupts to acquire the tax and judgment liens. We did not so intend. To secure reimbursement for the funds so advanced, Fish is entitled to benefit of the judgment and tax liens. The statutory time for filing general claims having expired and Fish having withdrawn his claim, he is not entitled to an allowance for any excess of such advances not satisfied by his securities. But a secured creditor does not lose his lien by failure to file a claim. Remington on Bankruptcy, vol. 2, § 910; Ward v. First Nat. Bank of Ironton, Ohio, 6 Cir., 202 F. 609, 612; Courtney v. Fidelity Trust Co., 6 Cir. 219 F. 57, 63; In re Cherokee Public Service Co., 8 Cir., 94 F.2d 536, 538. The trustee took the bankrupt estate subject to Fish's lien.

Hence, Fish is still entitled to the benefit of his securities and may enforce them in a proper proceeding. He may, if he so elect, file a petition against the trustee in the bankruptcy court seeking an enforcement of his securities and in that event, the referee should order sale of the tax and judgment liens to satisfy Fish's advances unless the trustee make reimbursement to Fish therefor.

The referee reserved any rights that the Blue River Company may have to file claim for reclamation. It was not the intention of this court to pass upon or foreclose any right that the Blue River Company may have by way of reclamation.

It is so ordered. In other respects, the petition for rehearing is denied.

---

[9] Sec. 1, Chandler Act, June 22, 1938, c. 575, 52 Stat. 840, 11 U.S.C.A. § 108, sub. a; Bankruptcy Act of 1898, c. 541, § 68, sub. a, 30 Stat. 565; Cumberland Glass Mfg. Co. v. De Witt, 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042; In re Rosenbaum Grain Corp. (Nairn v. J. A. Acosta & Co. et al.), 7 Cir., 103 F.2d 656; Prudential Ins. Co. of America v. Nelson, 6 Cir., 101 F.2d 441; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, decided Dec. 4, 1939.

[10] § 23, sub. b, Bankruptcy Act; 11 U.S.C.A. § 46, sub. b; In re Jackson Brick & Tile Co., D.C., 189 F. 636, and authorities therein cited; In re Hanson, D.C., 18 F.2d 440; White v. Schloerb, 178 U.S. 542, 20 S.Ct. 1007, 44 L.Ed. 1183; In re Hollingsworth & Whitney Company, supra; In re Drayton, D.C., 135 F. 883, and authorities cited; In re Cann, D.C., 47 F.2d 661; In re Pilsener Brewing Co., 9 Cir., 79 F.2d 63.

[11] The six cases: Nos. 1925, 1968 and 2023 brought up under one transcript (Tr., pp. 1–752), and the other three cases under separate transcripts. No. 1955 (pp. 1–47), No. 2005 (pp. 1–17) and No. 2007 (pp. 1–79), are consolidated for the purposes of this opinion.